# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

```
=================================
                                  :
ORIGINCLEAR INC. D/B/A            :
ORIGINCLEAR, PROGRESSIVE WATER    :        Case No. 6:20-cv-07026-FPG
TREATMENT INC. D/B/A PROGRESSIVE  :
WATER TREATMENT, and TENER RIGGS  :
ECKELBERRY JR.,                   :
                                  :        AMENDED COMPLAINT
                                  :
              Plaintiffs,         :
                                  :
         v.                       :
                                  :
GTR SOURCE, LLC and TZVI "STEVE"  :
REICH,                            :
                                  :
              Defendants.         :
                                  :
=================================
```

Plaintiffs ORIGINCLEAR, INC. ("*OriginClear*" or the "*Company*"), PROGRESSIVE WATER TREATMENT, INC. ("*Progressive*", and together with OriginClear, the "*Business Plaintiffs*") sued herein as PROGRESSIVE WATER TREATMENT, INC. D/B/A ORIGINCLEAR, and TENER RIGGS ECKELBERRY JR. ("*Riggs*", and together with the Business Plaintiffs, the "*Plaintiffs*"), through counsel, states for its Complaint against Defendants GTR SOURCE, LLC ("*GTR Source*") and Tzvi "Steve" Reich ("*Reich*", and together with GTR Source, the "*Defendants*") as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this plenary action pursuant to CPLR § 5015(a)(3) to vacate a Judgment by Confession dated August 28, 2018, and entered in Ontario County on March 20, 2019 (the "*Judgment*").  *See Merchant Funding Services LLC v. Volunteer Pharmacy Inc.*, 179 A.D.3d

1051 (N.Y. App. Div. 2d. Dep't 2020) (reversing the order of lower court and granting motion to vacate confession of judgment without prejudice to bring a plenary action).  The Judgment was based on an Agreement entered into between OriginClear and GTR Source, dated August 28, 2018, that was solely drafted, prepared, and created by Defendants and termed a "Merchant Agreement" (hereinafter, the "*August Agreement*", and together with the July Agreement, the "*Agreements*") (a copy of the August Agreement is attached hereto as **Exhibit 4**) but, as will be demonstrated in this action, by its own very terms, the transaction is nothing more than a risk-free loan.  Indeed, the August Agreement was purposely drafted by the Defendants, in its entirety, to contain specific language that attempted to disguise the August Agreement to be that of a sale of receivables, rather than a loan, in order to charge a criminally usurious interest rate without any recourse.  Plaintiffs are seeking in this complaint to vacate the judgment entered in the within Court under Index 123403/2019 pursuant to CPLR § 5015(a)(3) and have the August Agreement, along with all documents entered therewith, declared void *ab initio* pursuant to N.Y. Gen. Oblig. Law § 5-511, as it violates the criminal usury laws of the State of New York, *see* N.Y. Penal Law § 109.40, and is unconscionable and, thus, void and/or unenforceable; to have the Settlement Agreement, dated December 13, 2018, likewise, declared void and unenforceable as it is merely an extension of the usurious August Agreement and, therefore, also void *ab initio*; and for such other and further relief as this Court deems just and proper.  A true and accurate copy of the Judgment is uploaded as **Exhibit 7**.

## THE PARTIES

2.      Plaintiff OriginClear is a Nevada corporation and, at time of entry into the Agreement, maintained its principal place of business located at 525 S. Hewitt Street, Los Angeles, California 90013.  On July 1, 2020, OriginClear relocated its principal place of business to Florida.

3.     At all times mentioned herein, Plaintiff Riggs is an individual who at time of entry into the Agreement, was a resident of the State of California.  However, since July 1, 2020, Riggs has been a resident in the state of Florida.

4.     At all times mentioned herein, Plaintiff Progressive is a Texas corporation and, at time of entry into the Agreement, maintained its principal place of business located at 2535 E. University Drive, McKinney, TX 75069.  Progressive is a subsidiary of OriginClear, in which Plaintiff Riggs has an interest, that was not an actual party in interest to the subject August Agreement, but was improperly included in the Judgment.

5.     At all times mentioned herein, Defendant GTR Source is a limited liability company organized and existing under the laws of the State of New Jersey, authorized to conduct business in the State of New York and with an address at 111 John Street, Suite 1210, New York, NY 10038.

6.     At all times mentioned herein, Individual Defendant Tzvi "Steve" Reich is the President, a Manager and a Member of GTR Source, and holds a controlling interest in GTR Source.[1]  At all times material to this Amended Complaint, acting alone or in concert with others, Reich has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Amended Complaint.  Upon information and belief, Reich resides in Brooklyn, New York and, in connection with the matters alleged herein, transacts or has transacted business in the State of New York and throughout the United States.  As of the date hereof, Individual Reich is also a named defendant in: (i) an action entitled People of the State of New York, by Office of the New York State Attorney General v. Richmond Capital Group LLC et al,

---

[1] See Pineville Cmty. Hosp. Ass'n, Inc. v. Ram Capital Funding LLC, Index No. 514985/2018, NYSCEF Docket Entry No. 42 (Affidavit of Reich) (Kings Cnty. Sup. Ct. Oct. 29, 2018) (hereinafter, the "RAM Action") (identifying GTR as a "company of which I am a member and manage").

Case No. 451368/2020 (June 10, 2020) (the "*NY AG Action*"), and (ii) an action entitled *Federal Trade Commission v. RCG Advances, LLC et al*, Case No. 1:20-cv-04432 (S.D.N.Y. June 10, 2020) (the "*FTC Action*").  Both the NY AG Action and FTC Action allege that Reich, as a controlling person, acted unlawfully when providing substantially similar merchant cash advance financing to various small businesses.  Furthermore, the NY AG Action claims that the Defendants have, since 2015, collected over $75 million on more than 1,900 fraudulent, illegal loans.

## JURISDICTION

7.      This Court has jurisdiction over the subject matter and the Parties pursuant to 28 U.S.C. § 1331, as this case involves a question of federal law.

8.      This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts that cannot be reasonably separated.  Resolving Plaintiffs' federal and state law claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the Parties.

9.      Venue is proper, and Defendants are subject to the personal jurisdiction of this Court because GTR filed the Affidavit of Confession and procured the Judgement in the New York State Supreme Court for the County of Ontario, a court located within the District.  Accordingly, all or a significant portion of the events giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

10.     Plaintiff OriginClear commercializes modular, prefabricated, filter-free advanced systems for faster sanitation worldwide.  The Company sells and delivers a complete line of compact, on-site, point-of-use advanced Water Treatment and Conveyance products.  Through international licensing and partnerships, OriginClear's advanced technologies are being adopted to treat tough water problems in East and South Asia, Europe, the Middle East, and North America.

4

11.     Riggs is the President and CEO of OriginClear.

12.     As of December 31, 2019, there were 24 full-time employees employed at OriginClear.

**Predatory Lending Through MCAs**

13.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]

14.     The National Consumer Law Center reached the same conclusion:

> Merchant cash advances operate very similarly to payday **loans** and have similar problems.  A lump sum of cash is taken out as an advance on a borrower's future sales.  The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[3]

15.     The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's [usury] laws."[4]

---

[2]     Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, Bloomberg (Nov. 13, 2014), *available at:* https://www.bloomberg.com/news/articles/2014-11-13/ ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[3]     National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017), *available at:* https://www.nclc.org/images/pdf/banking_and_payment_systems/fintech/comments-fintech-jan2017.pdf (emphasis added).

[4]     Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, Office of the Comptroller of the Currency, at 5 (January 17, 2017 and April 14, 2017), *available at:* https://www.occ.treas.gov/topics/responsible-innovation/ comments/comment-nys-dept-financial-services.pdf.

16.     The New York Attorney General's Office has also acknowledged the damage these loans cause, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[5]

17.     In order to ensure that predatory MCA lenders can secure judgments against unsuspecting businesses and their owners, MCA lenders file the affidavits of confession of judgment in forums entirely related to the transaction, where they will be quickly processed absent an opportunity to challenge the validity of the underlying transaction.

18.     Indeed, between the beginning of 2012 and November 14, 2018, more than 3,000 judgments were entered in Ontario County, as opposed to the less than 700 granted in New York County.[6]

19.     The rampant victimization of small businesses across the country has led the New York Attorney General to put words into action and, on June 10, 2020, filed a petition against three (3) New York City-based merchant funding companies—Richmond Capital Group, LLC ("*Richmond*"), RAM Capital Funding LLC ("*RAM*"), and Viceroy Capital Funding Inc. ("*Viceroy*")—and its principals—Robert Giardina ("*Giardina*"), Jonathan Braun ("*Braun*"), **Reich,** and Michelle Gregg—for unlawfully loaning money to small business owners at astronomically-high interest rates, fraudulently charging undisclosed fees, debiting excess

---

[5]     Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, Office of the Comptroller of the Currency (January 17, 2017), *available at:* https://www.occ.treas.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

[6]     Zachary R. Mider and Zeke Faux, *Predatory Lenders Have Co-Opted New York's Court System To Put The Screws To Borrowers Nationwide*, Bloomberg (Nov. 29, 2018), *available at:* https://www.bloomberg.com/graphics/2018-confessions-of-judgment-new-york-court-clerks/.

amounts from merchants' bank accounts, and obtaining judgments against merchants by filing false affidavits in New York State courts.[7]

20.     Notably, Reich is the Managing Member of RAM and participates in the management of Richmond Viceroy, with each of the foregoing entities and Reich, individually, named defendants in the NY AG Action.  *See RAM Action*, Docket Entry No. 42, at ¶ 1; *NY AG Complaint*, at ¶ 32.

21.     Indeed, the Complaint filed in the NY AG Action, along with other filings, contend that GTR is an entity through which Reich sought to engage in the same unlawful lending practices that RAM is being prosecuted for.  *See NY AG Complaint*, at ¶ 119 (citing Affidavit of Nabih Kadri, owner of Smart Courier); *id.* at ¶ 175 (citing Affidavit of Reich filed in the RAM Action).

22.     The unconscionable and destructive conduct of toxic lenders masquerading as merchant funding lenders has also drawn the attention of the Federal Trade Commission  (the "*FTC*").[8]

23.     Also on June 10, 2020, the FTC filed a complaint against RCG Advances, LLC (f/k/a Richmond Capital Group, LLC), RAM, Giardina, Braun, and **Reich** for violating the Federal Trade Commission Act by substantially injuring consumers when engaging in unfair or deceptive acts or practices in connection with the unfair merchant funding financing.[9]  Specifically, the FTC

---

[7]     See New York Attorney General's Office, *Attorney General James Sues Predatory Lender That Threatened Violence and Kidnapping, and Illegally Collected Millions from Small Businesses (2020)*, *available at:*  https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender_-threatened-violence-and-kidnapping; *see also* NY AG Action; NYSCEF Docket Entry No. 1 (Verified Petition)    https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=xQp1AH5HpUiP4L0OD6Q07A== (hereinafter, the "*NY AG Complaint*").

[8]     *See*    Federal    Trade    Commission,    *RCG    Advances,    LLC,    available    at:*  https://www.ftc.gov/enforcement/cases-proceedings/192-3252/rcg-advances-llc.

[9]     *See*    Complaint    filed    in    *FTC    Action,    available    at:*  https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf    ("*FTC Complaint*").

noted that the defendants (i) falsely claimed that their financing products did not feature a personal guaranty or upfront costs, (ii) delivered less than the amount of financing promised, and (iii) engaged in unfair collection practices, including filing confessions of judgments in circumstances not permitted by their financing agreements, threatened physical violence and made unauthorized debits from consumers' accounts. *FTC Complaint*, at ¶ 15.

24.     The foreseeable consequences of GTR Source's lending practices are devastating to small businesses all across the country, which are the backbone of our economy.

25.     As one small business protection advocate has put it, MCA companies, like GTR Source, are "in the business of helping [small] businesses fail." *Bloomberg*, *supra*.

26.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business. *National Consumer Law Center*, *supra*.

27.     Simply put, MCA companies only care about whether they can collect upon a default.

**GTR Source's Unconscionable Predatory Conduct**

28.     GTR Source expressly markets its **loans** to desperate small businesses whom they know are desperate for capital and, sometimes, have taken out other loans with other MCA companies.

29.     In doing so, GTR Source knows that the borrower-merchant cannot repay these loans with its own revenue and that it would have to turn to other MCA companies for financing.

30.     GTR Source knows that its unconscionable business model leads to businesses failing and safeguards against through security agreements and personal guarantees.

31.     Indeed, that is exactly what happened here.

32.     To explain, OriginClear operated at a deficit between 2016 and 2018.  Progressive, the Company's subsidiary, and Riggs, individually, helped cover the Company's costs, as the Company was running at seven-figure net losses.

33.     For the full year 2016, the Company's total revenue was $5,071,095.00, but total operating expenses were $5,071,644.00 and total loss from operations was -$3,589,714.00.  The operating deficit was covered by funds received from investors who participated in OriginClear private placements, as well as monies received from convertible debt note financings.

34.     The Company's financial troubles got worse in 2017.

35.     For the full year 2017, the Company's total revenue fell to $3,355,632.00, with operating expenses of $5,943,915.00 and a total loss from operations of -$5,294,054.00.  The operating deficit was, likewise, covered by funds from investors who participated in OriginClear private placements, as well as monies received from convertible debt note financings.

36.     Unfortunately, the Company's financial troubles continued during 2018.

37.     For the full year 2018, the Company's total revenue was $4,637,698.00, but total operating expenses were $5,216,031.00 and total loss from operations was -$4,062,351.00.  This operating deficit was again covered by funds received from investors who participated in OriginClear private placements, as well as monies received from convertible debt note financings.

38.     In order to address its long-standing financial woes, OriginClear was put in touch with Defendant through a broker for hard money lenders.

**The Terms Of The GTR Source MCAs**

39.     On or about July 20, 2018, Plaintiffs and GTR Source entered into a misleadingly termed "Merchant Agreement" (the "*July Agreement*"), under which GTR Source loaned $160,000.00 to OriginClear in exchange for repayment in the amount of $239,840.00, thereby

imposing an effective interest rate of 49.90%[10], or **303.68% annualized**.[11]   A copy of the July Agreement is attached hereto as **Exhibit 1**.

40.     Pursuant to the terms of the July Agreement, the $239,840.00 would be repayable over an unspecified period of time, as 10% of OriginClear's eligible receivables[12] would be withdrawn each and every business day until the entire amount was repaid to GTR Source.

41.     Further, repayment would be made through daily ACH withdrawals from a designated OriginClear bank account.

42.     GTR Source determined, purportedly in "good faith", that the initial daily payment amount was **estimated** to be $3,999.00, which was supposedly based on the 10% of OriginClear's receivables that would, invariably, fluctuate from day-to-day, week-to-week, etc. throughout the duration of the repayment period.   However, neither a review nor an actual calculation of OriginClear's receivables was ever performed by GTR Source in connection with the 10% "specified percentage" of the future receipts

43.     Prior to issuing the funds, however, GTR Source required Riggs, individually and in his capacity as President of OriginClear, to execute a Security Agreement and Guaranty of

---

[10]   Calculated as follows: ((Repayment Amount *divided by* Loaned Amount) *minus* 1) = (($239,840 / $160,000) *minus* 1) = (1.499 - 1) = .499 or 49.90%.

[11]   In New York, total interest is determined by annualizing the rate charged.  *See* New York Penal Law § 190.40 ("...at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period..."); N.Y. Gen. Oblig. Law § 5-501; *Bakhash v. Winston*, 134 A.D.3d 468, 19 N.Y.S.3d 887 (App. Div. 1st Dep't 2015).

The annualized interest rate is calculated as follows: (1 *divided by* No. of Days for Repayment) *multiplied by* ((Total Repayment Amount *divided by* Principal Amount Loaned) *minus* 1) *then multiplied by* 365 Days in a Year.

Applied to the facts at hand: (1 *divided by* 59.9 days) *multiplied by* (($239,840.00 *divided by* $160,000.00) *minus* 1) *multiplied by* 365 *equals* 303.68%.

[12]   Pursuant to the first page of the July Agreement, the monies eligible for repayment would consist of OriginClear's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from [OriginClear's] customers and/or other third-party payors … for the payments due to [OriginClear] as a result of [OriginClear's] sale of goods or services…"

performance (hereinafter, the "*July Guaranty*") and an Affidavit of Confession of Judgment (the "*July Confession*"), respectively, despite the fact that neither of these documents were referenced or required under the July Agreement.   A copy of the July Confession is attached hereto as **Exhibit 2**, and a copy of the July Guaranty is attached hereto as **Exhibit 3**.

44.    The Security Agreement and Guaranty executed in connection with the July Agreement stated, in relevant part:

> **Security Interest.** [OriginClear] grants to [GTR Source] a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by [OriginClear], (b) all proceeds, as that terms is defined in Article 9 of the UCC, (c) all funds at any time in [OriginClear's] Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to [GTR Source] under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets").   [OriginClear] agrees to provide other security to [GTR Source] upon request to secure [OriginClear's] obligations under this Agreement.   [OriginClear] agrees that, if any time there are insufficient funds in [OriginClear's] Account to cover [GTR Source's] entitlements under this Agreement, [GTR Source] is granted a further security interest in all of [OriginClear's] assets of any kind whatsoever, and such assets shall then become Secured Assets.   These security interests and liens will secure all of [GTR Source's] entitlements under this Agreement and any other agreements now existing or later entered into between [OriginClear], [GTR Source] or an affiliate of [GTR Source]. [GTR Source] is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.
>
> [...]
>
> **Additional Collateral.**   To secure [OriginClear's] payment and performance obligations to [GTR Source] under the Guaranty, [Riggs] hereby grants [GTR Source] a security interest in (the "Additional Collateral").
>
> [...]

> **Remedies.**  Upon any Event of Default, [GTR Source] may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce or satisfy any obligations then owing to [GTR Source], whether by acceleration or otherwise.

*Id.*

45.     The July Guaranty further ensured that Riggs would be held personally liable for OriginClear's performance under the July Agreement:

> **Personal Guaranty of Performance.** [Riggs] hereby guarantees to [GTR Source] [OriginClear's] good faith, truthfulness and performance of all of the representations, warranties, covenants made by [OriginClear] in the Merchant Agreement…
>
> **Guarantor Waivers.**  In the event of a breach of the above, [GTR Source] may seek recovery from [Riggs] for all of [GTR Source's] losses and damages by enforcement of [GTR Source's] rights under this Agreement without first seeking to obtain payment from [OriginClear], any other guarantor, or any Collateral or Additional Collateral [GTR Source] may hold pursuant to this Agreement or any other guaranty.

*Id.*

46.     Said differently, GTR Source awarded itself a UCC security interest in the Plaintiffs' property, and reserved itself the right to seek repayment from any of the Plaintiffs in the event of default or, determined in GTR Source's sole discretion, a false and/or misleading representation, warranty, or covenant made in the Agreement or July Guaranty.

47.     Additionally, the July Confession states, in relevant part:

> [OriginClear and Progressive] hereby confess judgment and authorizes entry of judgment in favor of [GTR Source] and against [OriginClear and Progressive] … in the sum of $239,840.00 less any payments timely made pursuant to the secured Merchant Agreement dated 7/20/2018, plus legal fees to [GTR Source] calculated at twenty-five percent (25%) of the total of the aforementioned sums, costs, expenses and disbursements and interest at the rate of 9% per annum from 7/20/2018, or the highest amount allowed by law, whichever is greater.

*July Confession*.

48.     Furthermore, the immediately following paragraph states that Riggs, individually, also "hereby confess[es] judgment, individually and personally, jointly and severally, and authorize entry of judgment in favor of [GTR Source]..."

49.     In sum, the July Confession obligates Plaintiffs to make full repayment for the $239,840.00 repayment amount, regardless which event of default was actually triggered, plus legal fees that would be arbitrarily calculated at 25% of the outstanding repayment amount, plus interest at the highest interest rate legally permitted.

50.     Confusingly, however, on July 23, 2018, after OriginClear delivered the fully executed July Agreement, July Confession, and July Guaranty, OriginClear only received $120,002.00 from GTR Source, as $39,998.00 was withheld from the $160,000.00.

51.     The $39,998.00 withholding represents a 12.50% original issue discount ("*OID*")[13] and, thus, increases the effective interest rate to 99.86%, which skyrockets to **607.75% when annualized**.  *See* N.Y. Gen. Oblig. Law § 5-501.

52.     Between July 24, 2018 and August 29, 2018, GTR Source made daily withdrawals in the amount of $3,999.00 from OriginClear's accounts.  The total value of the payments during this period of time equals $107,973.

---

[13]   The difference between the redemption price at maturity and the issue price is the Original Issue Discount (OID).   *See* Internal Revenue Code, 26 U.S.C. § 1273; *see also Custom Chrome, Inc. v. Commissioner*, 217 F.3d 1117, 1122 (9th Cir. 2000) (noting that the original issue discount is the difference between the redemption price at maturity and issue price, and therefore, a type of interest).

Applied to the facts at hands: $21,865.00 *divided by* $240,000.00 (Loaned Amount) = OID Interest of 9.11%.

53.     In an effort to cure the excessive withholdings and deficient financing, OriginClear and GTR Source entered into the August Agreement at the suggestion of Reich.  However, the August Agreement only aggravated, rather than cured, the inferior financing problem.

54.     On August 28, 2018, OriginClear and GTR Source entered into the August Agreement, whereunder GTR Source loaned $240,000.00 (the "*Loaned Amount*") to OriginClear in exchange for repayment of $359,760.00 (the "*Repayment Amount*"),[14] thereby imposing an effective interest rate of approximately 49.90%[15], or **280.16%[16] annualized**, with a repayment term of approximately 65 business days. *See August Agreement*.

55.     Similar to the July Agreement, the Loaned Amount would be repaid over an unspecified period of time, as 10% (the "*Specified Percentage*") of OriginClear's eligible receivables[17] would be withdrawn, via ACH withdrawals, each and every business day until the entire amount was repaid to GTR Source.

56.     Further similar to the July Agreement, on August 28, 2018, Riggs was required to execute an Affidavit of Confession of Judgment contemporaneously with the August Agreement,

---

[14]   The August Agreement incorporated the July Agreement and was intended to provide OriginClear with additional financing that had, confusingly, been withheld from the July Agreement.  Thus, the $120,002.00 net amount of funds loaned to OriginClear (of the $160,000.00) and the $131,867.00 paid to the amount owed under the July Agreement ($239,840.00) were incorporated into the August Agreement.

    Consequently, by supplementing the amounts advanced and to be repaid as set forth in the July Agreement, GTR Source imposed additional interest on the Repayment Amount in the August Agreement. Stated differently, the $239,840.00 repayment amount set forth in the July Agreement (which already had interest imposed thereon), now had additional, double interest imposed thereon, which resulted in the $359,760.00 Repayment Amount.

[15]   Calculated as follows: (Repayment Amount *divided by* Loaned Amount) *minus* 1 = ($359,760 / $240,000) *minus* 1 = 1.499 *minus* 1 = .499 or 49.90%.

[16]   Calculated in accord with the formula set forth above in FN 11.

[17]   Identically to the July Agreement, the August Agreement stated that the monies eligible for repayment would consist of OriginClear's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from [OriginClear's] customers and/or other third-party payors … for the payments due to [OriginClear] as a result of [OriginClear's] sale of goods or services…"

materially identical to the July Confession, which was, once again, drafted in favor of the Defendant and against each of the Plaintiffs captioned herein (the "*August Confession*").  The August Confession includes each of the Plaintiffs referred to as Judgments Debtors.  A copy of the August Confession is attached hereto as **Exhibit 5**.

57.     Further similar to the July Agreement, on August 28, 2018, Riggs, individually and in his capacity as President of OriginClear, was required to enter into a Personal Guaranty of Performance (the "*August Guaranty*") contemporaneously with the August Agreement.  A copy of the August Guaranty is attached hereto as **Exhibit 6**.

58.     The August Guaranty was materially identical to the July Guaranty: GTR Source reserved itself a UCC security interest in all of OriginClear's accounts and Riggs' personal assets, and further bound Riggs to personally guarantee OriginClear's complete performance of its duties and obligations imposed in the August Agreement.  *Id.*

59.     On August 29, 2018, but only after the August Agreement, August Confession, and August Guaranty were all executed and delivered to GTR Source, GTR Source disbursed only $82,137.00 of the additional funds to OriginClear, bringing the total amount of monies provided to OriginClear to the $202,139.00 (*i.e.*, the Loaned Amount *minus* $37,861.00 in withholdings), despite the fact that the August Confession and August Guaranty were not part of the August Agreement.

60.     Upon receiving the aggregate funding of merely $202,139.00 (from the agreed upon $240,00.00) and noticing the substantial withholdings, OriginClear's controller promptly contacted Reich and requested an explanation for nearly $40,000.00 being withheld from the August Agreement that was purposefully entered into to *cure* the deficient funding made under the July Agreement.  After several discussions, Reich agreed to refund $15,996.00 on October 14,

2018 (more than 6 weeks after the additional funding made under the August Agreement, during which GTR Source continued to make withdrawals from OriginClear's account), bringing the aggregate amount of monies actually loaned and received by OriginClear to $218,135.00.

61.     As noted above, GTR Source drafted, prepared, and created the August Agreement as a purchase of future receivables, calling it a "Merchant Agreement", in addition to drafting, preparing, and creating the August Confession and August Guaranty.  Conversely, OriginClear had no involvement in the preparation of the foregoing documents.

62.     All of the aforementioned transaction documents—the Agreements, the August Confession, and August Guaranty—were emailed to California from out-of-state so it could be signed by Riggs.

63.     According to the terms of the August Agreement, the Purchased Amount was to be repaid through daily withdrawals (a "*Daily Payment*") from a designated OriginClear bank account in a fluctuating amount in accord with the Specified Percentage.  The Daily Payment was estimated, by GTR Source, to initially be in the amount of $5,534.00, which was supposedly based on the 10% OriginClear's receivables that would, invariably, fluctuate from day-to-day, week-to-week, etc. during the repayment period.  However, neither an updated review nor an actual calculation of OriginClear's receivables was ever performed by GTR Source in connection with the 10% "Specified Percentage" of the future receipts.

64.     The Authorization Agreement for ACH Credits and ACH Debits, attached to the August Agreement, was a foreshadowing that the initial estimated payment amount of $5,534.00 was, in fact, a daily, fixed repayment requirement (the "*Authorization Agreement*").

65.     Indeed, while the Specified Percentage suggested that OriginClear's payment obligations would fluctuate, the Authorization Agreement dictated that GTR Source would make withdrawals in the amount of $5,534.00 each weekday from OriginClear's accounts.

66.     In accord with the Authorization Agreement, between August 30, 2018 and October 30, 2018, GTR Source made daily withdrawals always in the amount of $5,534.00 from OriginClear's accounts.   The total value of the payments during this period of time equals $243,496.00.

67.     Notably, however, on October 8, 2018, OriginClear's financial controller contacted Reich to request a reconciliation of the Daily Payment (which, per the unambiguous terms of the August Agreement, was supposed to be in an amount equal to 10% of OriginClear's receipts received from the sale of OriginClear's goods and services), as the $5,534.00 was considerably in excess of the true 10% of OriginClear's receipts (which, in fact, were much closer to $1,751.00, or **approximately one-third** of $5,534.00).   A copy of the email communications between OriginClear's controller and Reich is attached hereto **Exhibit 8** (hereinafter, the "*Reconciliation Emails*").  *See id.*, at 6.

68.     OriginClear's controller tried to explain to Reich that the $5,534.00 payments, which no longer represented 10% of OriginClear's receipts, were "seriously creating a financial strain for" the Company.  *See id.*

69.     After providing OriginClear's bank statements to GTR Source and explaining to Reich that certain funds disclosed therein were monies received from investors participating in an OriginClear private placement offerings and not funds generated from the sale of OriginClear's goods and services and, thus, not to be considered for calculation of the Daily Payment, Reich **rejected OriginClear's request for reconciliation**—as the August Agreement only stated that

GTR Source "***may***" reconcile in its sole discretion and as it deems appropriate—and, instead, proposed that the parties enter into a third, new Merchant Agreement with the same Daily Amount. *See Reconciliation Emails*, at 3, 6.

70.     OriginClear promptly rejected Reich's proposal, explaining that OriginClear had received deficient funding under both the July Agreement and the August Agreement (the latter of which was entered into to cure the July Agreement's excessive withholdings), and requested, **once again**, a reconciliation, either in the amount of $1,751.00 (using an average of the Company's receivables from the sale OriginClear's goods and services during August 2018 and September 2018) or $2,299.00 (strictly using the Company's receivables from the sale OriginClear's goods and services during September 2018, which were higher than normal).  *See Reconciliation Emails*, at 2.

71.     In other words, even applying the Specified Percentage to the average of the abnormally higher receivables OriginClear experienced during August 2018 and September 2018, which yielded a $2,299.00 Daily Amount, GTR Source mandated that repayment continued to be made in the amount of $5,534.00, which was **more than double** the true 10% of OriginClear's receipts from the sale of its goods and services.

72.     Reich, once again and contrary to its own website (discussed below) and a valid, lawful MCA, **<u>rejected</u>** OriginClear's request for reconciliation and, instead, stated that he "would rather just file", presumably, a legal claim, which GTR Source ultimately brought against OriginClear for the outstanding amount owed.

73.     In a final attempt, OriginClear's controller requested a reconciliation, explaining that while the Specified Percentage was agreed upon and would remain fixed, the Daily Payment was an estimate and, per the terms of the August Agreement, should fluctuate and correspond with

any and all changes (both good and bad) in OriginClear's receivables.  *See Reconciliation Emails*, at 1.

74.     Reich, on behalf of GTR Source, once again **rejected** OriginClear's request for a reconciliation and, adding insult to injury, proposed that he would only agree to reduce the Daily Payment if OriginClear wired a $100,000.00 payment (fully aware that the Company was financially strained).  *See id.*

75.     In the absence of a reconciliation, GTR Source made daily withdrawals between July 24, 2018 and October 30, 2018—with withdrawals in the amount of $3,999.00 made between July 24 and August 29, and then withdrawals in the amount of $5,534.00 made between August 30 and October 30—totaling to $351,469.00.[18]

76.     To put this in perspective, OriginClear received a total of $218,135.00 from GTR Source and paid back $351,469.00 in the span of just 14 weeks (or less than 4 months).[19]

77.     Notably, the monies used for repayment were actually the monies that had been loaned from GTR Source (*i.e.*, the Loaned Amount), along with funds received from a convertible note financing and private placement offering, **instead** of funds sourced from OriginClear's eligible receivables.  *See July Agreement*, at 1; *August Agreement* (same).  Indeed, the funds advanced under the July Agreement were funded on or about July 23, 2018, and the first payment was **debited the next day**.

78.     Said differently, the funds used to repay GTR Source were not actually derived from OriginClear's receivables, as had been agreed upon in the Agreements.

---

[18]   Prior to entry into the August Agreement, twenty-seven (27) withdrawals were made, each in the amount of $3,999.00, from OriginClear's bank account between July 24, 2018 and August 29, 2018, in accord with the terms set forth in the July Agreement.

[19]   A copy of the Affidavit of Tener Riggs Eckelberry Jr. filed in the originating action, *OriginClear Inc et al v. GTR Source LLC*, Index No. 128146-2020 (Ontario Cnty. Sup. Ct.), and Exhibits A through H are attached hereto as **Exhibit 10** (hereinafter, the "*Riggs Aff.*").

79.     After making numerous requests to reconcile the Daily Amount, all of which were declined by GTR Source, on October 30, 2018, OriginClear ceased allowing withdrawals as it was no longer able to sustain the financial burden.

80.     It is important to note that, as of October 30, 2018, merely $8,291.00 remained payable under the August Agreement.

**GTR Source Falsely Advertises The True Nature Of Its Financing Arrangements**

81.     On its own website, GTR Source specifically targets small and medium businesses in need of financing.[20]



**GTR SOURCE LLC**      Home    About    Services    Partner With Us    Contact Us    Apply Now

*Who We Are*

In order to offer the most competitive services, we streamline our application and screening processes in order to get you the funds you need quicker. By doing so, you get even faster access to capital means for your business to propel and stay on track.

We also take a unique approach to credit history when compared to traditional banking systems. Rather than looking back six years, GTR Source LLC pays attention to the recent work history of the company. This relevant information influences our lending decisions, not mistakes from six years ago. We understand that merchant cash advances can be a lifeline for business owners to have necessary cash for daily operations, so we have created an expedited process for these reasons.

Another benefit of the merchant cash advance for small to medium companies is the repayment schedule. Merchant cash advances do not have fixed payment amounts each month with a final end payment date. Instead, repayments are based in part by sales, providing repayment flexibility to business owners.

If you are interested in gaining capital to keep your business running and take advantage of the increasing demand, perhaps it is time to talk about a merchant cash advance. Move beyond the long waits for paperwork approval and consider the benefits of fast decisions, flexible repayments, and the opportunities that come with available working capital.

82.     With respect to lawful MCAs, as advertised on the GTR Website, the reconciliation provision is a fundamental, necessary characteristic of a valid MCA.  It ensures that, unlike a loan, that merchant-borrower is equipped with the necessary right to compel an adjustment in the repayment obligation so it comports with the agreed upon percentage of receivables.  *See NY AG*

---

[20]   *See generally* GTR Source LLC Website, *available at:* http://www.gtrsourcellc.com/ Home/#scrolltop ("We understand that merchant cash advances can be a lifeline for business owners…") (hereinafter, the "*GTR Website*").

*Complaint*, at ¶ 7; *FTC Complaint*, at ¶ 27 (noting that merchants are entitled to "important contractual and legal rights, including the right to have their payments reduced or reconciled…").

83.    GTR Source even acknowledges this distinguishing characteristic on its website: "Another benefit of the merchant cash advance for small to medium companies is the repayment schedule. **Merchant cash advances do <u>NOT</u> have fixed payment amounts** each month with a final end payment date.  Instead, repayments are based in part by sales, **providing repayment flexibility** to business owners." *GTR Website* (emphasis added).

84.    The failure to equip a merchant-borrower with a mandatory reconciliation right causes the repayment obligation to materially alter the substance of the transaction so that it is, instead, **a loan**.

85.    Confusingly, GTR Source's website further falsely claims:

> **Easy Payback**
>
> **One of the most beneficial aspects of Merchant Cash Advance is that instead of a payment book** staring at you from your accounting books **with pre-established due dates**, you know the percentage of credit card transactions that you will use to repay the cash infusion. For you this means that **your repayment amount is proportionate and comfortable for your budget**.

<u>Id.</u> (emphasis added).

86.    Had this actually been true, GTR Source would have reconciled OriginClear's daily payment obligations with its eligible receivables instead of insulting its employees, threatening legal action, and withdrawing a fixed amount each and every business day.

## The Facts Demonstrate That The Transactions Are Loans

87.    Despite the self-serving titles of the Agreements, each was, in economic reality, a loan that was absolutely repayable.  Among other hallmarks of a loan:

a.    the Daily Payments were fixed—as shown by GTR Source's withdrawal history and the permissive language set and Reich's repeated rejections of OriginClear's request to reconcile—and the so-called reconciliation provision was a mere subterfuge to avoid New York's usury laws. Rather, just like any other loan, the Repayment Amount was to be repaid within a specified time;

b.    the default and remedy provisions purport to hold OriginClear absolutely liable for repayment of the Purchased Amount. Indeed, the loans sought to obligate OriginClear to ensure sufficient funds were maintained in the designated account to make the Daily Payment, and in the event OriginClear was in default the outstanding balance of the Repayment Amount purportedly immediately became due and payable;

c.    the Agreements were underwritten based upon an assessment of OriginClear's credit worthiness, **not** the creditworthiness of any account debtor;

d.    while the Agreements purported to "assign" all of OriginClear's future account receivables to GTR Source until the Repayment Amount was paid in full, OriginClear retained all indicia of ownership of the account receivables, including the right to collect, possess, and use the proceeds thereof. Indeed, rather than purchasing receivables, GTR Source merely acquired a security interest in OriginClear's accounts to secure payment of the Repayment Amount;

e.    the Repayment Amount was not calculated based upon the fair market value of OriginClear's future receivables, but rather was unilaterally decided by GTR Source based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, GTR Source did not request any information concerning OriginClear's account debtors upon which to make a fair market determination of their value;

f.    the amount of the Daily Payments was based upon when GTR Source wanted to be paid, and not based upon any good-faith estimate of OriginClear's future account receivables;

g.    GTR Source assumed no risk of loss due to OriginClear's failure to generate sufficient receivables to make the Daily Payments because the failure to maintain sufficient funds to make timely payment in the designated account constituted a default under the Agreements;

h.    GTR Source required that OriginClear undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the Company would continue to operate and generate receivables and a breach of such obligations, representations, and

warranties constituted a default, which fully protected GTR Source from any risk of loss resulting from OriginClear's failure to generate and collect receivables; and

i.     GTR Source required that OriginClear grant GTR Source a security interest in its receivables and other intangibles and, further that Riggs personally guarantee the performance of the representations, warranties and covenants.

88.     GTR Source also required that Riggs execute a personal guaranty of performance, which purported to guarantee the Company's performance and the accuracy of certain representations, warranties, and covenants contained therein.

89.     Section 2.10 (Unencumbered Receipts) of each of the Agreements required OriginClear to represent and warrant that it had "good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of [GTR Source]." *July Agreement*, at ¶ 2.10; *August Agreement* (same).

90.     Section 2.12 (No Violation of Prior Agreements) of each of the Agreements further required OriginClear to represent and warrant that its "execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which [OriginClear] is subject, including any arrangement that prohibits the sale or pledge of [OriginClear's] future receipts." *July Agreement*, at ¶ 2.12; *August Agreement* (same).

91.     GTR Source, however, knew from day one that other MCA companies were taking daily debits from OriginClear's bank account before it entered into the transactions contemplated

in each of the Agreements.  Indeed, OriginClear was subject to **three (3) MCAs** with other lenders that were entered into prior to the July Agreement:

- MCA dated July 12, 2018 by and between OriginClear and ML Factors Funding LLC, purportedly loaning $200,000.00 in exchange for repayment in the amount of $292,000.00, repayable in the form of 10% of OriginClear's receivables;

- MCA dated July 17, 2018 by and between OriginClear and C6 Capital LLC, purportedly loaning $175,000.00 in exchange for repayment in the amount of $255,500.00, repayable in the form of 15% of OriginClear's receivables; and

- MCA dated July 23, 2018 by and between OriginClear and Yellowstone Capital LLC ("*Yellowstone*"), purportedly loaning $150,000.00 in exchange for repayment in the amount of $224,850.00, repayable in the form of 25% of OriginClear's receivables.[21]

92.     Thus, from the outset, the transactions were unconditionally repayable—despite the fact that the aforementioned MCAs siphoned off approximately 65% of OriginClear's receivables—by virtue of the encumbrance of OriginClear's receivables and its knowledge that entering into the agreement with GTR Source would result in a breach of the other, preexisting MCA agreements.  Moreover, GTR Source had full recourse protection based on the security interest and personal guaranty provided under the July Guaranty and superseding August Guaranty, see **Exhibits 3** and **6**, respectively, permitting GTR Source to go after Riggs in the event the Company breached any of these representations and warranties—which is exactly what GTR Source did.

---

[21]    For the sake of transparency, the MCA entered into with Yellowstone was entered into by OriginClear and Progressive, the Company's wholly-owned subsidiary.  In light of the fact that Progressive is a wholly-owned subsidiary, the two entities share a single bank account that is maintained and controlled by OriginClear.

**GTR Source's Actions Demonstrate That The Transactions Were Absolutely Repayable And GTR Source Assumed No Risk**

93.     As further security to ensure that the loans were repayable, GTR Source also required Riggs to sign affidavits confessing judgment.  *See* **Exhibits 2** and **5**.

94.     Despite the fact that OriginClear was, financially, hanging by a thread, GTR Source used several methods to extract additional money.

95.     ***First***, GTR Source sought the assistance of Corporate Turnaround[22]—a business entity that, purportedly, "helps" smaller businesses in financial distress by, among other things, negotiating debts absent any inputs or assistance from admitted attorneys[23]—to negotiate "favorable" settlement terms for the outstanding balance remaining due under the August Agreement.

96.     Notably, as of October 30, 2018 (i.e, the date of the last withdrawal made by GTR Source), OriginClear had paid a total of $351,469.00 to GTR Source and, thus, merely $8,291.00 remained payable under the August Agreement.

97.     Despite the fact that less than $10,000.00 remained outstanding under the August Agreement, on December 13, 2018, OriginClear entered into a settlement agreement developed by Corporate Turnaround and entered into by and between the Company and GTR Source (the "*Settlement Agreement*"), pursuant to which OriginClear agreed to pay an aggregate amount of **$80,000.00—approximately 10 times** what remained outstanding and payable—in thirty-eight

---

[22]   The footer on the Settlement Agreement notes that Corporate Turnaround is located at 95 Route 17 South, Paramus, NJ 07652.  Concerningly, however, "Corporate Turnaround" does not appear to be registered to conduct business in the State of New Jersey.  Furthermore, Corporate Turnaround is regularly utilized by merchant funding lenders to "negotiate" a settlement that often saves borrowers a de minimis amount of monies, if any, compared to a recently awarded under a judgment obtained by an affidavit of confession and materially incomplete affidavit in support.

[23]   Corporate Turnaround, *available at:* https://www.corporateturnaround.com/.

(38) equal, monthly installment payments of $2,000.00 between January 25, 2019 and April 25, 2022.  A copy of the Settlement Agreement is attached hereto as **Exhibit 9**.

98.    The Settlement Agreement embodied the Parties' understanding that payment of the $80,000.00 would be in complete satisfaction of any claims that GTR Source may have against OriginClear in connection with the August Agreement.

99.    Accordingly, the Agreements and the Settlement Agreement collectively imposed an obligation on OriginClear to repay GTR Source $431,469.00, in exchange for borrowing merely $218,135.00.  When evaluating the total funds to be repaid versus the total funds OriginClear received, the effective interest rate is 75.27%.

100.    Particularly noteworthy is the language set forth in the opening paragraph of the Settlement Agreement, which states:

> **Full Satisfaction:** By initiating a settlement offer and signing this agreement, [GTR Source] agrees to the settlement terms as complete satisfaction for all claims [GTR Source] may have against [OriginClear] and any guarantors or other liable parties.  **[GTR Source] agrees to CEASE any and all collection efforts including** but not limited to the following: **written and verbal demands for payment**, filing of lawsuits, proceeding with pending lawsuits (as these suits are to be marked settled with the court by [GTR Source's] representative, **docketing and execution of judgment**, garnishments and post judgment procedures.

*Settlement Agreement* (emphasis added).

101.    In other words, following entry into the Settlement Agreement, GTR Source acknowledged and agreed that it would no longer pursue collection efforts through, among other methods, the filing of the August Confession.

102.    Additionally, the Settlement Agreement provided for a moratorium should OriginClear's financial condition deteriorate:

26

**Variance:** Due to the financial condition of [OriginClear], [GTR Source] hereby agrees to a thirty-day moratorium for every four-month period, and any remaining period, of the payment terms being agreed to herein.   Moratoriums may be used cumulatively, consecutively and **without notice**.

**Default:** Default shall be defined as the failure of [OriginClear] to make payment(s) according to the terms agreed to herein, **which is not covered by any variance**… In the event that any payment is not received according to the terms herein … [GTR Source] agrees to notify [Corporate Turnaround] in writing and provide [OriginClear] with a ten-day period to cure before declaring [OriginClear] in default.

*Settlement Agreement* (emphasis added).

103.     Following entry into the Settlement Agreement, OriginClear paid 14 monthly installment payments to GTR Source in the total amount of $28,000.00, reducing the amount owed under the Settlement Agreement to $50,000.00 and bringing the total amount of consideration paid to GTR Source to $379,469.00.  As a result, OriginClear was entitled to, at a minimum, a 90-day moratorium, that could be utilized without notice.

104.     On or about March 14, 2020, OriginClear ceased making payments to GTR Source under the Settlement Agreement because of the severe financial hardship the Company began to experience, largely due to the COVID-19 pandemic.

105.     Thus, if OriginClear sought protection of the moratorium it was entitled to, GTR Source was not permitted to entertain any collective efforts until, at the earliest, June 12, 2020.

106.     Furthermore, GTR Source was obligated to provide OriginClear with a 10-day period to cure before declaring it in default.

107.     However, as will be discussed below in greater detail, GTR Source acted in direct contravention of this unambiguous term.

108.    **Second,** on or about March 19, 2019, absent any notice to the Plaintiffs, GTR Source moved to obtain a judgment against the Plaintiffs in Ontario County, New York, by filing the August Affidavit of Confession signed by Riggs, individually and in his capacity as President of OriginClear.

109.    As of the date thereof, it is important to note that:

a.    OriginClear had paid an aggregate amount of $379,469.00, from which $28,000.00 had been paid under the Settlement Agreement and $351,469.00 paid under the Agreements, from which (i) $107,973.00 was paid under the July Agreement and (ii) $243,496.00 was paid under the August Agreement; and

b.    under the explicit terms and conditions of the Settlement Agreement, GTR Source had agreed that it agreed to cease any all collection efforts, including the filing of the August Confession.

110.    Despite the fact that GTR Source agreed that it would not file the August Confession and, thus, would only be entitled to enforce the legal rights and remedies afforded by the Settlement Agreement (*e.g.*, alleging a breach of contract claim in the event OriginClear ceased making timely payments thereto), GTR Source filed the August Confession signed by Riggs, individually and in his capacity as President of OriginClear, in Ontario County Supreme Court. *See GTR Source LLC v. OriginClear Inc et al*, Index No. 123403-2019.

111.    In order to mislead and induce the Clerk of Ontario County to enter the request judgment, GTR Source, by and through counsel, prepared and filed an affidavit executed by Reich (the "*Reich Aff.*"), requesting entry of a Judgment By Confession against each of the Plaintiffs in the amount of $143,083.17 arising from Plaintiffs' alleged default under the August Agreement.

112.    Multiple aspects of the Reich Aff. are materially incorrect and misleading, including:

> a.     it entirely fails to disclose the parties' entry into the Settlement Agreement, and that GTR Source had agreed to cease any and all collection efforts against OriginClear, including the filing of the August Confession; and
>
> b.     that an outstanding balance of $114,264.00 remained under the terms of the August Agreement.

113.     With respect to the latter, as of March 19, 2019, OriginClear had paid $379,469.00 to GTR Source, or **$21,709.00 more than what was owed** under the usurious August Agreement.

114.     On March 20, 2019, relying solely on the documents filed with the Court, a Judgment was entered entitling GTR Source to recover $143,083.17 from Plaintiffs, consisting of: (i) the purported $114,264.00 that remained due under the August Agreement; (ii) $28,566.00 in legal fees, which were requested absent any affidavit or supporting invoices establishing the legal services for which GTR Source was being compensated and, instead, appear to be arbitrarily calculated as 25% of the purported amount remaining unpaid (*see* August Confession, at ¶ 5). *See Judgment.*

115.     ***Third,*** Defendants sent written demands for payment to OriginClear's customers.

116.     On or about March 2020,[24] **during the moratorium period**, legal counsel for GTR Source sent a letter to Delek US, a customer of Progressive who recently placed an order for in the amount of $96,489.00. *See Riggs Aff.*, at ¶ 15; *id.* at **Exhibits D** (pgs. 49-61) and **E** (pgs. 62-64). If the order was consummated, Progressive stood to receive approximately $11,000.00 in profits. *See id.* at ¶ 19; *id.* at **Exhibit F** (pgs. 65-66).

---

[24]     Plaintiffs wish to inform the Court that the date on which the Delek Letter was mailed cannot be verified, as OriginClear was not the recipient and, further, Delek has not yet communicated a specific date on which the letter was received.  Instead, Marc Stevens, President of Progressive, communicated on September 11, 2020 that Delek reported to him that the letter was received "earlier this year."  Accordingly, Plaintiffs believe that the Delek Letter was, instead, sent on or about March 2020, and not on or about March 2019 (*i.e.*, the date listed on the Delek Letter).

117.    Much like the Reich Aff., the Delek Letter contained numerous material misstatements and omissions.

118.    To explain, enclosed with the cover letter from counsel were copies of (1) the August Agreement, (2) the August Guaranty, and (3) a UCC financing statement filed with the California Secretary of State.  Noticeably absent is a copy of, let alone any reference to, the Settlement Agreement.  Despite this material misrepresentation, the cover letter from legal counsel claims:

> Pursuant to the enclosed Agreement, GTR Source, LLC purchased $359,760.00 of [OriginClear's] future accounts.  The Agreement was structured so that GTR Source, LLC was to receive a portion of all the [OriginClear's] deposits.  In accordance with the Agreement, GTR Source, LLC filed a UCC-1 financing statement with the Secretary of State of California, thereby obtaining a perfected security interest in the [OriginClear's] assets, including without limitation, the [OriginClear's] accounts receivables.  A copy of the UCC-1 is also enclosed herein for your reference.

119.    Further troubling is that in addition to communicating Delek's receipt of the Delek Letter, Delek also informed Progressive that a payment block had been in effect by GTR Source, likely under the August Guaranty.  *See August Guaranty* ("This security interest may be exercised by [GTR Source] without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets.").  *See Riggs Aff.*, at ¶ 18; *id.* at **Exhibit G** (pgs. 67-68).

120.    Simply stated, GTR Source immediately disregarded the clear terms of the Settlement Agreement and employed various methods to continue to collect monies to which it was not entitled.

121.    On October 6, 2020, Progressive learned that the Delek contract was taken to another supplier and, thus, was deprived of a sale in the amount of $96,489.00, from which

Progressive anticipated to receive approximately $11,000.00 in profits. *See Riggs Aff.*, at ¶¶ 19, 21; *id.* at **Exhibits F** (pgs. 65-66) and **H** (pgs. 69-70).

122.    Unfortunately, OriginClear has no means to confirm how long the payment block has been in effect and whether additional letters were sent out by GTR Source to other OriginClear customers that interfered with the Company's business relations and were sent in violation of the Settlement Agreement.

<u>**FIRST CAUSE OF ACTION**</u>

**Vacatur Of Confession Of Judgment Pursuant To CPLR § 5015(a)(3)**

123.    Plaintiffs repeat and reallege the allegations set forth above herein.

124.    On or about July 20, 2018, a document described as a Merchant Agreement for the purported purchase of OriginClear's future accounts was executed by Riggs in his capacity as President and CEO of OriginClear.

125.    The amount loaned under the July Agreement was $160,000.00, with a repayment amount of $239,840.00.   The difference from the purchase price and purchase amount is $79,840.00, representing an effective interest rate of 49.90% that becomes 303.68% when annualized.   However, after the OID is factored in, the effective interest rate rises to 99.86%, or **607.75% when annualized**.   The difference between the amount actually loaned and the repayment price is the redemption price, and the redemption price over the amount loaned is an OID as defined by the Internal Revenue Service. *See* Internal Revenue Code, 26 U.S.C. § 1273

126.    On or about August 28, 2018, a second document also described as a Merchant Agreement for the purported purchase of OriginClear's future accounts was executed by Riggs in his capacity as President and CEO of OriginClear.

127.    The Loaned Amount under the Agreement was $240,000.00, with a Repayment Amount of $359,760.00.    The difference from the purchase price and purchase amount is $119,760.00, representing an effective interest rate of 49.90% that becomes 280.16% when annualized.  However, after the OID is factored in, the effective interest rate rises to 64.93%, or **364.53% when annualized**.  See Internal Revenue Code, 26 U.S.C. § 1273.

128.    The interest rate imposed in each of the Agreement easily exceeds such rate of interest as may be authorized by law at the time the loan or forbearance is made, interest shall not be charged, taken, or received.  See N.Y. Gen. Oblig. Law § 5-501(4).

129.    New York Penal Law § 190.40 absolutely forbids interest rates in excess of 25% annually and applies to loans up to $2.5 million.

130.    Furthermore, the civil usury statute, N.Y. Gen. Oblig. Law § 5-501, bars interest rates above the level set in § 14A of the Banking Law—currently 16% annually.

131.    Pursuant to N.Y. Gen. Oblig. Law § 5-511, the operative August Agreement is void *ab initio* as it contracted and imposed an effective interest rate of 64.93% **(364.53% annualized)**, which not only violates the New York civil usury threshold of 16%, but also the New York criminal usury threshold of 25%.

132.    There were no maturity dates stated in either of the Agreements between the parties. However, because GTR Source made fixed, daily withdrawals from OriginClear's accounts (as opposed to confirming that the monies withdrawn for repayment were actually 10% of OriginClear's accounts receivable), maturity dates for both of the Agreements can be readily calculated and ascertained with certainty.  *See Riggs Aff.*, at ¶ 9; *id.* at **Exhibit B** (pgs. 33-45).

133.    Indeed, under the terms of the July Agreement, OriginClear had merely 60 days to repay the $239,840.00 due thereunder.  Since GTR Source made the first withdrawal on July 24,

2018, had the July Agreement been paid in full under the terms set forth therein, the maturity date of **Wednesday, October 17, 2018** is easily identifiable (after excluding weekends and holidays: Labor Day and Columbus Day). *Id.*

134.    Likewise, under the terms of the August Agreement and after deducting the $107,973.00 that OriginClear had paid up to August 29, 2018, OriginClear had merely 46 days to repay the remaining $251,787.00 due under the August Agreement, giving rise to the readily ascertainable maturity date of **Monday, November 5, 2018** (after excluding weekends and holidays: Labor Day and Columbus Day). *Id.* at ¶¶ 9-10.

135.    The August Agreement purports to calculate the daily initial repayment amount as 10% of the receipts of OriginClear.  However, **both** the $3,999.00 and $5,534.00 were amounts far greater than 10% of such receipts during the relevant time periods.

136.    Plaintiff made daily payments to the Defendant between July 24, 2018 and October 30, 2018, totaling to $351,469.00.

137.    Notably, the purported reconciliation provision set forth in the August Agreement states the following:

> [GTR Source] **MAY**, upon [OriginClear's] request, adjust the amount of any payment due under this Agreement **at [GTR Source's] SOLE DISCRETION** and AS IT DEEMS appropriate.

*August Agreement*, at 1 (emphasis and capitalization added).

138.    Simply stated, numerous New York courts have found this permissive language **insufficient** to provide a mandatory reconciliation provision and, thus, weighs in favor of finding the transaction a loan.

139.    Further demonstrating that the reconciliation provision was not mandatory and, instead, remained within the exclusive control and discretion of Defendant, at no point during the

repayment period was a reconciliation ever performed, nor was a credit issued to OriginClear by GTR Source for daily payments that were made in excess of the Company's true 10% of its receivables.

140.     Indeed, between October 8, 2018 and October 10, 2018, OriginClear made **multiple attempts** to reconcile the Daily Payment so it more accurately represented 10% of the Company's receivables.  Despite making several requests, which were paired with financial statements (in accord with the August Agreement) indicating the amount that represented the true 10% of OriginClear's receivables, GTR Source (via Reich) **<u>rejected</u>** each and every request as it was not required to do so and, thus, GTR Source never reconciled the Daily Payment in accord with the Specified Percentage, contrary to the terms of a valid MCA.

141.     On or about August 28, 2018, Riggs signed and delivered to GTR Source the August Guaranty.

142.     The August Guaranty by Riggs further demonstrates that Defendant was, at no time, at risk of losing any money loaned to Plaintiffs by entering into the August Agreement.

143.     Defendant was guaranteed repayment of the Purchased Amount on the August Agreement by the August Guaranty.

144.     Aside from the August Guaranty, the Defendant also sought recourse through the August Confession.

145.     Plaintiffs seek to vacate the Judgment which was based on misrepresentations made by Defendant and/or misconduct of Defendant, who knew or should have known that (i) the August Agreement upon which the Judgment was secured from was both usurious and unconscionable and (ii) the filing of the August Confession was in direct contravention of the terms agreed upon in the Settlement Agreement.

## SECOND CAUSE OF ACTION

**Declaratory Judgment That The Transactions Are Loans And Violate
New York's Criminal Usury Statute And, Thus, Are Void And/Or Unenforceable
Pursuant To N.Y. Gen. Oblig. Law § 5-511**

146.    Plaintiffs repeat and reallege the allegations set forth above herein.

147.    It is well settled that contracts that violate statute are void by statute and unenforceable as against public policy.  This contract principle is further visible in New York statute and holdings of numerous courts: that a usurious contract is void at its inception and, thus, any subsequent understanding (*e.g.*, a settlement agreement), likewise, is void *unless* it purges itself of the unlawful usury (*i.e.*, all interest in excess of 25% per annum).  *See* N.Y. Gen. Oblig. Law § 5-511; *Sabine v. Paine*, 223 N.Y. 401, 404 (N.Y. 1918); *In re Estate of Jackson*, 120 A.D.2d 309, 313 (3rd Dep't 1986).

148.    As a result of the facts described in the foregoing paragraphs, Defendant facilitated a transaction that imposes a criminally usurious interest rate, in violation of N.Y. Gen. Oblig. Law § 5-501.

149.    Defendant intended to, and did in fact, charge and reserve to itself a criminally usurious rate of interest from the outset of the transaction.

150.    Plaintiffs, in good faith, request the Court declare: (i) pursuant to New York law, the August Agreement and Settlement Agreement are criminally usurious; and (ii) the August Agreement and Settlement Agreement are void and unenforceable pursuant to N.Y. Gen. Oblig. Law § 5-511 and/or portions are unenforceable.

## THIRD CAUSE OF ACTION

### N.Y. Gen. Oblig. Law § 5-513

151.    Plaintiffs repeat and reallege the allegations set forth above herein.

152.    The August Agreement is a loan made to a business entity and, thus, is subject to the maximum interest rate of 25%.  *See* New York Penal Law § 190.40; N.Y. Gen. Oblig. Law § 5-501.

153.    N.Y. Gen. Oblig. Law § 5-513 states:

> Every person who, for any such loan or forbearance, shall pay or deliver any greater sum or value than is allowed to be received pursuant to section 5-501, and his personal representatives, **may recover in an action against the person who shall have taken or received the same … amount of the money so paid or value delivered, above the rate aforesaid**.

(emphasis added).

154.    Pursuant to the terms of the August Agreement, GTR Source allegedly loaned $240,000.00 to OriginClear, with a maturity date of Monday, November 5, 2018.  Consequently, the transaction imposes an effective interest rate of 49.90% when using the Loaned Amount, but an annualized interest rate of 280.16%.

155.    Notably, had an annualized interest rate of 25% been applied to the $240,000.00 allegedly loaned to OriginClear, OriginClear only would have been obligated to repay $254,944.61 to GTR Source (assuming the same duration for the repayment period).

156.    However, GTR Source, in fact, only loaned $218,135.00 to OriginClear, after withholding $21,865.00 from the Loaned Amount.  Despite the reduced amount of funds received, OriginClear was expected to repay the loaned monies by the same maturity date (*i.e.*, Monday, November 5, 2018).

157.    Consequently, the transaction imposes an effective interest rate of 64.93% when using the net aggregate amount of funds received, but an annualized interest rate of 364.53%.

158.    Notably, had an annualized interest rate of 25% been applied to the $240,000.00 allegedly loaned to OriginClear, OriginClear only would have been obligated to repay $231,718.09

to GTR Source (when applying a 25% per annum interest rate to the net amount received of $218,135.00 and assuming the same duration for the repayment period).

159.     However, as of the date hereof, OriginClear has paid $379,469.00 to GTR Source due to the obligations imposed under the Agreements and Settlement Agreement.

160.     Said differently, OriginClear paid, at a minimum, $149,750.91 in excess, unlawful interest to GTR Source, which it seeks recovery of herein.

## FOURTH CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(c))

161.     Plaintiffs repeat and reallege the allegations set forth above herein.

162.     18 U.S.C § 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity **or collection of unlawful debt**.

## Culpable Persons

163.     Reich and GTR Source are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

164.     At all relevant times, each of Reich and GTR Source was, and is, a "person" that exists separate and distinct from the RICO enterprise, described below.

165.     Upon information and belief, Reich is the President, a Manager, and a Member of GTR Source, and holds a controlling interest in GTR Source.

166.    GTR Source is a limited liability company organized and existing under the laws of the State of New Jersey.

167.    GTR Source solicits, underwrites, funds, services, and collects upon unlawful debt incurred by small businesses located across the United States.

A.  **The Enterprise**

168.    GTR Source's investors (the "*Investors*"), Richmond, RAM, Viceroy, Berkovitch & Bouskila, PLLC ("*Berkovitch*"), and Law Offices of Isaac H. Greenfield, PLLC ("*Greenfield*" and together with Berkovitch, the "*Debt Collectors*") constitute an association-in-act enterprise (the "*Enterprise*"), separate and distinct from the culpable persons, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

169.    The Investors, Richmond, RAM, Viceroy and the Debt Collectors are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing criminal enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, underwriting, and collecting upon usurious loans that charge interest at more than twice the lawful maximum rate under the laws of New York and other states.

170.    Upon information and belief, since at least 2013 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including OriginClear.

171.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt[25] within the meaning of 18 U.S.C §§ 1961(6) and 1962(c) and (d) because (i) it violates applicable New York State criminal usury statutes and (ii) the rates are more than twice the legal rate.  Here, the annualized rate charged to OriginClear exceeded 360%, a rate that is **more than 24 times** the legal maximum of twenty-five percent (25%) that is permitted under New York Penal Law § 190.40.

B.    **Each Member's Role in the Enterprise**

172.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a common structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

*Reich*

173.    Upon information and belief, Reich is the President and a Manager of GTR Source. Upon information and belief, Reich is responsible for the day-to-day decisions and operations of GTR Source and has the final say on all business decisions of the Enterprise, including, without limitations, which usurious loans the Enterprise will fund, how such loans will be funded, which of the Investors will fund each loan, and the ultimate payment terms and amount and period of each usurious loan, including the Agreements.

174.    Upon information and belief, in his capacity as the day-to-day leader of the Enterprise, Reich is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the formation of the so-called "merchant funding agreements" used by the Enterprise

---

[25] 18 U.S.C § 1962(6) defines "unlawful debt" as "a debt … which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."

to attempt to disguise unlawful, usurious loans as agreements for the purchase of accounts receivable to avoid applicable usury laws; (ii) using the so-called "merchant funding agreements" to conceal the Enterprise's collection of unlawful debts; (iii) using automatic bank account withdrawals to collect the daily and/or weekly payments; (iv) the formation of affidavits of confession used by the Enterprise to collect the unlawful debt if the borrower defaults on their obligations; and (v) submission of affidavits to the court seeking a judgment in favor of GTR Source upon default of a borrower.

175.    Upon information and belief, Reich has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting new members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

176.    Reich has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to GTR Source and to the Investors of the deals in which he, upon information and belief, has personally participated.

### GTR Source

177.    Directly and through Reich and its other agents, GTR Source has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  GTR Source has been and continues to be responsible for: (i) soliciting borrowers to enter into usurious loans; (ii) entering into so-called "merchant funding agreements" on behalf of the Enterprise; (iii) pooling the funds of Investors in order to fund each usurious loan; (iv) underwriting the usurious loans and determining the ultimate rate of usurious interest to be

charged under each loan; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon unlawful debt; (vii) acquiring a personal guaranty on behalf on the borrower to secure the loan; and (viii) obtaining judgements in its name to further collect upon the unlawful debt.

178.    In this case, GTR Source: (i) underwrote the Agreements; (ii) entered into the Agreements; (iii) pooled funds from Investors to fund the Agreements; (iv) collected upon the unlawful debt evidenced by the Agreements by effectuating daily ACH withdrawals from OriginClear's bank account; and (iv) upon OriginClear's alleged default, sought to obtain a Judgment in GTR Source's name and collect upon the unlawful debt evidenced therein.

179.    Upon information and belief, GTR Source ultimately benefits from the Enterprises unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, GTR Source has directly participated.

### The Investors

180.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing GTR Source with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements, and other financial arrangements with borrowers to collect upon the unlawful debt.

181.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

*Richmond*

182.    Directly and through Reich and its other agents, Richmond has been an active participant in the operation of the Enterprise and its affairs, and in the orchestration, perpetuation, and execution of the Enterprise's collection of unlawful debt.  Richmond has been responsible for: (i) soliciting borrowers to enter into usurious loans; (ii) entering into so-called "merchant funding agreements" on behalf of the Enterprise; (iii) pooling the funds of Investors in order to fund each usurious loan; (iv) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon unlawful debt; (vii) acquiring a personal guaranty on behalf on the borrower to secure the loan; and (viii) obtaining judgements in its name to further collect upon the unlawful debt.

183.    Further, when Richmond came under investigation, rather than ceasing its unlawful lending and collection practices, upon information and belief, Richmond redirected the Enterprise's unlawful activity to other members of the Enterprise (*i.e.*, GTR Source).[26]

---

[26] *See NY AG Action*, NYSCEF Docket Entry No. 7 (Affirmation of John P. Figura in Support of Verified Petition) (hereinafter, the "*Figura Aff.*") (*available at:* https://iapps.courts.state.ny.us /nyscef/ViewDocument?docIndex_=fvdz0vKv4N4OemfccGNKfQ==), at ¶ 175; *id.*, NYSCEF Docket Entry No. 82 (Ex. 75 - Affidavit of Nabih Kadri) (*available at:* https://iapps.courts.state.ny.us/nyscef/ViewDocument?          docIndex=qu79OjtPAHGnzUve2f4ttA==) (detailing that his business, Smart Courier, initially entered into a merchant agreement with Richmond, but on or about March 6, 2018, entered into a new merchant agreement with GTR Source that would extinguish the outstanding debt owed to Richmond); *Figura Aff.*, at ¶ 12 (noting that the New York Attorney General's investigation began in late 2018 after several investigative publications reported on the toxic, merchant funding industry and Richmond's involvement); NYSCEF Docket Entry No. 46 (Transcript of Miriam Deutsch, in connection with NY Attorney General's investigation of merchant cash advance practices of Richmond, Viceroy, RAM and GTR) (*available at:* https://iapps.courts.state.ny.us /nyscef/ViewDocument?docIndex=sR4OKvDJs8mY8/0vniHpBA==), at pg. 17, 25 (stating she is a broker and helped broker merchant cash advance deals for Richmond, Viceroy, RAM and GTR); *id.*, NYSCEF Docket Entry No. 98 (Ex. 91 - Affidavit of Paul Price) (*available at:* https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=ExiSHj0L2A/Z7S/UxTbOIA==) (stating that after speaking with a merchant cash advance broker, 3 separate merchant cash advance agreements for Richmond, GTR Source and Yellowstone were presented to him).

184.     Upon information and belief, Richmond ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, Richmond has directly participated.

### RAM

185.     Directly and through Reich and its other agents, RAM has been an active participant in the operation of the Enterprise and its affairs, and in the orchestration, perpetuation and execution of the Enterprise's collection of unlawful debt.  Richmond has been responsible for: (i) soliciting borrowers to enter into usurious loans; (ii) entering into so-called "merchant funding agreements" on behalf of the Enterprise; (iii) pooling the funds of Investors in order to fund each usurious loan; (iv) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon unlawful debt; (vii) acquiring a personal guaranty on behalf on the borrower to secure the loan; and (viii) obtaining judgements in its name to further collect upon the unlawful debt.

186.     Further, when RAM came under investigation, rather than ceasing its unlawful lending and collection practices, upon information and belief, RAM redirected the Enterprise's unlawful activity to other members of the Enterprise (*i.e.*, GTR Source).

187.     Upon information and belief, RAM ultimately benefits from the Enterprises unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, RAM has directly participated.

### *Viceroy*

188.    Directly and through Reich and its other agents, Viceroy has been an active participant in the operation of the Enterprise and its affairs, and in the orchestration, perpetuation and execution of the Enterprise's collection of unlawful debt.  Viceroy has been responsible for: (i) soliciting borrowers to enter into usurious loans; (ii) entering into so-called "merchant funding agreements" on behalf of the Enterprise; (iii) pooling the funds of Investors in order to fund each usurious loan; (iv) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon unlawful debt; (vii) acquiring a personal guaranty on behalf on the borrower to secure the loan; and (viii) obtaining judgements in its name to further collect upon the unlawful debt.

189.    Further, when Viceroy came under investigation, rather than ceasing its unlawful lending and collection practices, upon information and belief, Viceroy redirected the Enterprise's unlawful activity to other members of the Enterprise (*i.e.*, GTR Source).

190.    Upon information and belief, Viceroy ultimately benefits from the Enterprises unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, Viceroy has directly participated.

### *Debt Collectors*

191.    Berkovitch is a professional service limited liability company organized under the laws of the State of New York, and specializes in the collection of business debts.

192.    Greenfield is a professional service limited liability company organized under the laws of the State of New York, and specializes in the collection of business debts.

193.    Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the Defendants' direction, the Debt Collectors prepared and filed complaints or, as was the case here, affidavits, which were executed by Reich and/or other employees of GTR Source, that falsely represent the transactions constitute lawful sale and purchase of future receivables in order to conceal the usurious and unlawful nature of the transactions and induce courts of the State of New York and elsewhere to enter judgments in favor of GTR Source,[27] in addition to the Judgment entered against Plaintiffs.

194.    Together with these affidavits and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, the Debt Collectors have filed hundreds, if not thousands, of affidavits of confessions with the Clerks of the Courts of the State of New York.[28]   In reliance upon the false affidavits of Reich and other employees of GTR and the confession affidavits, the Clerks of the Courts of the State of New York entered judgments in favor of GTR Source that, based upon the representations made by GTR Source in the supporting affidavits, include not only

---

[27] *See, e.g.*, *GTR Source, LLC v. Logan Electrical Contracts L.L.C., et al*, Index No. 603197/2020 (Complaint); *GTR Source, LLC v. The Jog Group LLC, et al*, Index No. 617473/2019 (same); *GTR Source, LLC v. San Saba Nursing and Rehab Center LLC, et al*, Index No. 524373/2019 (same); *GTR Source, LLC v. Bachson Academy, LLC, et al*, Index No. 523668/2019 (same).

[28] *See, e.g.*, *GTR Source, LLC v. Hiit Zone LLC, et al*, Index No. EF001824-2018 (Affidavit of Confession); *GTR Source, LLC v. BMNY Contracting Corp., et al*, Index No. 60172/2019 (same); *GTR Source, LLC v. SYMCO USA LLC, et al*, Index No. E169277/2019 (same); *GTR Source, LLC v. VA Transport, Inc., et al*, Index No. EFCA2019-001259 (same); *GTR Source, LLC v. Eulogio Romero Camacho, et al*, Index No. 123988-2019 (same); *GTR Source, LLC v. Alge Transport Inc., et al*, Index No. 123565-2019 (same); *GTR Source, LLC v. Double Z Transportation, LLC, et al*, Index No. EFCA2019-000836 (same); *GTR Source, LLC v. ABT Holdings Inc., et al*, Index No. 123281-2019 (same); *GTR Source, LLC v. Provision Supply LLC, et al*, Index No. 505352/2019 (same); *GTR Source, LLC v. Solar Energy Designs, et al*, Index No. 503988/2019 (same); *GTR Source, LLC v. White Hawk Inc., et al*, Index No. 703103/2019 (same); *GTR Source, LLC v. GCA Investments Inc., et al*, Index No. 122314-2019 (same); *GTR Source, LLC v. Medisale Inc., et al*, Index No. 150294/2019 (same);  *GTR Source, LLC v. Spirit Leatherworks, LLC, et al*, Index No. 819763/2018 (same).

the outstanding sums of principal and usurious interest allegedly due and owed under the loans, but also fees for attorneys' services that have not, and may never be, rendered.

195.     In this case, upon the Plaintiffs' alleged default under the Settlement Agreement, at Reich's direction, Berkovitch prepared an affidavit, executed by Reich, that intentionally misrepresented the nature of the transaction as the sale of receivables and entirely failed to acknowledge the existence of the Settlement Agreement in order to induce the Clerk of the Supreme Court of New York, Ontario County to enter a judgment against Plaintiffs on account of the unlawful debt, which he did.

196.     Upon obtaining the Judgment on March 20, 2019, Berkovitch, acting under the color of New York law and at the Defendants' direction, sent notices to the Business Plaintiffs' customers, including but not limited to Delek.

197.     The Debt Collectors ultimately benefit from the Enterprise's unlawful activity by receiving a portion of the unlawful debt collection as a fee.

**C.  Interstate Commerce**

198.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

199.     Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to facilitate their day-to-day activities, including to originate, underwrite, fund, service, and collect upon the usurious loans made by the Enterprise to entities in California, including the Plaintiffs, and other states across the United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

200.    In the present case, all communications between the members of the Enterprise and Plaintiffs were by interstate telephone, email and mail, wire transfers or ACH debits, and other interstate wire communications.  Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Payments via interstate electronic ACH debits.  In addition, at the direction of GTR Source, each of the Agreements were executed by Riggs, on behalf of OriginClear and individually as a guarantor, and original copies of the Agreements and the corresponding affidavits of confession were sent from California to GTR Source at its offices in New York via FedEx.

**D.  Injury and Causation**

201.    Plaintiffs have and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

202.    The injuries to the Plaintiffs were directly, proximately, and reasonably foreseeably resulting from or caused by Defendants' violations of 18 U.S.C. § 1962(c) include, but are not limited to, the hundreds of thousands of dollars paid to GTR Source by the Plaintiffs or otherwise collected by GTR Source on account of the usurious and unenforceable Agreements; lost profits; damages to the Plaintiffs' reputation and goodwill; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting the Defendants' unlawful activities and wrongful activities with OriginClear business opportunities.

203.    Further, Defendants continue to engage in the offensive and unlawful conduct as of the date hereof.  *See GTR Website* (marketing Merchant Cash Advance financing products and encouraging interested businesses to contact GTR Source).

204.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus attorneys' fees and costs from the Defendants.  The Court should also consider such equitable relief as it deems just and proper to prevent the Defendants from further attempting to collect on the Agreements and/or Settlement Agreement and to undo, vacate, or otherwise strike any subpoenas, levies, security interests, liens, powers of attorney, and other encumbrances and/or enforcement devices issued by or at the direction of any Defendant to collect the unlawful debt.

**FIFTH CAUSE OF ACTION**

**Conspiracy under 18 U.S.C. § 1962(d)**

205.    Plaintiffs repeat and reallege the allegations set forth above herein.

206.    Defendants unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

207.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

208.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was

a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debts, including the Agreements.

209.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

210.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations in 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands in improperly collected loan payments; the entry and enforcement of the Judgment; lost profits; damages to the Plaintiffs' reputation and goodwill; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing the RICO Defendants criminal activities.

211.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus attorneys' fees and costs from the Defendants.  The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund, and collect upon unlawful debt, including the Agreements and/or Settlement Agreement and to undo, vacate, or otherwise strike any subpoenas, levies, security interests, liens, powers of attorney, and other encumbrances and/or enforcement devices issued by or at the direction of any Defendant to collect the unlawful debt.

## **SIXTH CAUSE OF ACTION**

### **Unjust Enrichment**

212.    Plaintiffs repeat and reallege the allegations set forth above herein.

213.    As a result of Defendant's unlawful actions described herein, Defendant has and continues to be unjustly enriched at the expense of Plaintiffs as a result of their payment of excessive, improper and unlawful interest rates.

214.    Under the circumstances described herein, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from the Plaintiffs.

215.    Defendant should be required to disgorge the monies they have unjustly obtained to the detriment of Plaintiffs.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a.    Declaring the August Agreement to be a criminally usurious loan in violation of New York Penal Law § 190.40 and thus void and unenforceable pursuant to N.Y. Gen. Oblig. Law § 5-511;

b.    Declaring the August Agreement, Settlement Agreement, and any and all documents related thereto null, void, and unenforceable as they arise from the criminally usurious loan, and violate New York statute and the State's fundamental public policy against usury;

c.    Vacating the Judgment, which was based on the August Confession, due to Defendants' misconduct and misrepresentations and conduct in contravention of the unambiguous terms of the Settlement Agreement;

d.    Directing Defendants to make restitution to Plaintiffs in the amount of the interest in excess of the amount that would have been permitted to charge or receive under New York's usury laws;

e.      Pursuant to N.Y. Gen. Oblig. Law § 5-513, awarding Plaintiffs damages in the amount of $379,469.00 that was used as payments made to Defendant arising from the usurious July Agreement, August Agreement, and Settlement Agreement;

f.      In the alternative, awarding Plaintiffs damages in the amount of usurious interest paid as of the date hereof, which is calculated to be $147,750.91;

g.      Permanently enjoining Defendants from engaging in the unlawful conduct described above, including entering into or collecting on any further judgments based on the usurious loan August Agreement and any other agreement arising from the usurious loan August Agreement (*i.e.*, the Settlement Agreement);

h.      Awarding Plaintiffs compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined a trial;

i.      Awarding punitive damages and/or treble damages as the Court deems appropriate;

j.      Requiring Defendants to pay Plaintiffs' attorneys' fees and costs;

k.      Granting a preliminary injunction enjoining Defendant from taking any further action to enforce the judgment; and

l.      Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues properly so tried.

DATED: February 12, 2021

Respectfully submitted,

_/s/ Eric J. Benzenberg_

Eric J. Benzenberg
**THE BASILE LAW FIRM P.C.**
390 N. Broadway, Suite 140
Jericho, NY 11753
Tel.: (516) 455 -1500
Fax: (631) 498-0478
Email:

_Lead      Attorney      for      Plaintiffs_
_OriginClear, Inc., Progressive Water_
_Treatment, Inc. and Tener Riggs_
_Eckelberry Jr._

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on the 12th of February, 2021, I caused to be served a true and correct copy of Plaintiffs' Amended Complaint as filed by and through the District Court's electronic filing/ECF system and that such true copy is available for downloading and viewing by all counsel of record.


DATED: February 12, 2021                       *_/s/ Eric J. Benzenberg_*
                                             Eric J. Benzenberg