UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────

ORIGINCLEAR INC, et al.,

                          Plaintiffs,

v.                                              Case # 20-CV-7026-FPG

                                                                                      DECISION AND ORDER

GTR SOURCE, LLC, et al.,

                          Defendants.
───────────────────────────────────────

## INTRODUCTION

On February 12, 2021, Plaintiffs, OriginClear, Inc. ("OriginClear"), Progressive Water Treatment, Inc. ("Progressive"), and Tener Riggs Eckelberry Jr. ("Riggs) (collectively, "Plaintiffs"), filed an Amended Complaint asserting, *inter alia*, New York usury law claims, claims pursuant to the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), and a claim for unjust enrichment. ECF No. 12. In response, Defendants, GTR Source, LLC, ("GTR") and Tzvi "Steve" Reich ("Reich") (collectively "Defendants"), filed a Motion to Dismiss for failure to state a claim. ECF No. 16. Plaintiffs filed a response, ECF No. 19, Defendants replied, ECF No. 21, and after seeking Court approval, Plaintiffs filed a sur-reply, ECF No. 24, and later, a letter in further support of their position, ECF No. 25.

For the reasons discussed, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

# BACKGROUND[1]

OriginClear, a company that sells a line of on-site, point-of-use water treatment products, operated at a financial deficit between 2016 and 2018. ECF No. 12 ¶¶ 10, 32. Specifically, in 2016, OriginClear's revenue was $5,071,095, operating expenses were $5,071,644, and total loss from operations was $3,589,714. *Id.* ¶ 33. In 2017, the total revenue was $3,355,632, operating expenses were $5,943,915, and total loss from operations was $5,294,054. *Id.* ¶ 35. In 2018, the total revenue was $4,637,698, operating expenses were $5,216,031, and total loss from operations was $4,062,351. *Id.* ¶ 37. In an attempt to address these financial issues, Plaintiffs contacted GTR. *Id.* ¶ 38.

Defendant GTR, a Merchant Cash Advance ("MCA") company, markets its service to desperate small businesses that in some cases have done business with other MCA companies. *Id.* ¶ 28. MCAs operate similarly to payday loans—a lump sum of cash is taken out as an advance on a borrower's future sales, which are paid back, in addition to an expensive premium, through automatic deductions from the borrower's bank account. ECF No. 12 ¶ 14.

## I.     July and August Agreements

On July 20, 2018, OriginClear and GTR entered into a "Merchant Agreement" (the "July Agreement"), under which GTR loaned $160,000 to OriginClear in exchange for repayment in the amount of $239,840. *Id.* ¶ 39. Pursuant to the July Agreement, OriginClear's repayment amount would be made through daily withdrawals from a designated OriginClear bank account in the amount of $3,999. *Id.* ¶ 42. This amount was determined by GTR to be a "good faith" estimate of 10% of OriginClear's accounts receivables. *Id.* However, at no time did GTR review or

---

[1] Unless otherwise noted, the following allegations are taken from Plaintiffs' Amended Complaint, ECF No. 12, and accepted as true for purposes of the motion.

calculate OriginClear's receivables. *Id.*  According to Plaintiffs, this imposed an effective interest rate of 49.9%, or 303.68% annually. *Id.* ¶ 39.

Prior to issuing funds, GTR required Riggs, individually and in his capacity as President of OriginClear, to execute a Security Agreement, Guaranty of Performance, and Affidavit of Confession of Judgment. ECF No. 12 ¶ 43.  Essentially, the documents provided GTR with a security interest in Plaintiffs' property and gave GTR the right to seek repayment from any of the Plaintiffs in the event of default or a false and/or misleading representation, warranty, or covenant made in the July Agreement or Guarantee—a condition which was to be determined at GTR's sole discretion. *Id.* ¶ 46.  The Confession also required, in the event of a default, that Plaintiffs cover legal fees in the amount of 25% of the outstanding repayment amount, plus interest at the highest rate permitted. *Id.* ¶ 49.

After delivering the fully executed July Agreement—including the Confession and Guaranty—OriginClear received $120,002 from GTR. *Id.* ¶ 50.  $39,998 was withheld. *Id.*  The withholding thus effectively increased the interest rate to 99.86%, or 607.75% annually. *Id.* ¶ 51. Between July 24, 2018, and August 29, 2018, GTR made daily withdrawals from OriginClear's accounts totaling $107,973.  ECF No. 12 ¶ 52.

In an attempt to cure the deficient financing provided under the July Agreement, the parties entered into another Merchant Agreement on August 28, 2018 (the "August Agreement"). Pursuant to the August Agreement, GTR loaned $240,000 to OriginClear in exchange for repayment in the amount of $359,760. *Id*. ¶ 54.  Pursuant to the August Agreement, OriginClear's repayment amount would be made through daily withdrawals from a designated OriginClear bank account in the amount of $5,534. *Id.* ¶ 63.  This amount was determined by GTR to be 10% of OriginClear's eligible receivables. *Id.*  However, at no time was a review or actual calculation of

OriginClear's receivables performed by GTR. *Id.* According to Plaintiffs, this imposed an effective interest rate of 49.9%, or 280.26% annually. *Id.* ¶ 54.

Like the July Agreement, prior to issuing funds, GTR required Riggs, individually and in his capacity as President of OriginClear, to execute a Security Agreement, Guaranty of Performance, and Affidavit of Confession of Judgment which were materially identical to those executed in accordance with the July Agreement. ECF No. 12 ¶¶ 56-58. After delivering the fully executed documents, OriginClear received an additional $82,137, thus, bringing the total amount of money provided to OriginClear to $202,139, rather than the agreed upon $240,000. *Id.* ¶ 59. Noticing the withholdings, OriginClear's controller contacted Reich and requested an explanation for why nearly $40,000 was being withheld. *Id.* ¶ 60. After discussions, Reich agreed to refund OriginClear $15,996, bringing the aggregate amount of funds received by OriginClear to $218.135. *Id.* Throughout this period, GTR continued to make withdrawals from OriginClear's account. *Id.*

On October 8, 2018, in accordance with the August Agreement, OriginClear's financial controller contacted Reich to request a reconciliation of the daily payment, as the $5,534 withdrawal was much higher than 10% of OriginClear's eligible receivables (which was actually about $1,751) and was creating serious financial strain. *Id.* ¶¶ 67, 68. Despite providing OriginClear's bank statements and explaining the sources of various funds, Reich rejected OriginClear's reconciliation request. ECF No. 12 ¶ 69. Instead, Reich suggested the parties enter into *another* Merchant Agreement. *Id.* OriginClear rejected the offer and again requested reconciliation either in the amount of $1,751, or in the amount of $2,299 (calculated using receivables from the high performance of September 2018). *Id.* ¶ 70. Again, the request was rejected, and Reich stated that he "would rather just file," presumably, a legal claim, than agree to

the reconciliation. *Id.* ¶ 72. A third reconciliation request was made and again rejected. *Id.* ¶¶ 73-74. Instead, Reich proposed that OriginClear wire a $100,000 payment to GTR, in exchange for a later reduction in daily payment. *Id.* ¶ 74. Plaintiffs did not agree.

Despite OriginClear's numerous failed attempts at reconciliation, GTR continued to make daily withdrawals. The withdrawals amounted to $351,469. ECF No. 12 ¶ 75. In other words, OriginClear received $218,135 from GTR and paid back $351,469 in less than four months. *Id.* ¶ 76.

## II.   Settlement Agreement

As of the date of the last withdraw, October 30, 2018, $8,291 remained payable under the August Agreement. *Id.* ¶ 96. Nevertheless, on December 13, 2018, the parties entered a settlement agreement (the "Settlement") wherein OriginClear agreed to pay $80,000 to GTR through 38 equal monthly installments—beginning January 15, 2019—in complete satisfaction of the August Agreement. *Id.* ¶ 97, 98. Pursuant to the Settlement, GTR agreed that it would no longer pursue collection efforts. *Id.* ¶ 101.

OriginClear paid in accordance with the Settlement for 14 months—bringing the total amount of consideration paid to GTR between the July Agreement, August Agreement, and Settlement to $379,469. *Id.* ¶ 103. Pursuant to the plain language of the Settlement, OriginClear was then entitled to a 90-day moratorium that could be utilized without notice. ECF No. 12 ¶ 103. While OriginClear sought the moratorium protection to which it was entitled, GTR was not permitted to pursue collect for a 90-day period and was obligated to provide OriginClear with a 10-day period to cure any potential default. *See id.* ¶¶ 104-06.

Yet, without giving notice to Plaintiffs, and contrary to the Settlement, on March 19, 2019, GTR moved to obtain a judgment in Ontario County, New York, by filing the August Confession. *Id.* ¶ 108, 110.  Judgment was thereafter entered in favor of GTR.[2]  *Id.* ¶ 114.

On October 12, 2020, Plaintiffs filed the present action in state court.  On December 2, 2020, Defendants removed.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief is plausible when the plaintiff pleads facts sufficient to allow the Court to draw reasonable inferences that the defendant is liable for the alleged misconduct.  *Id.*  In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).  At the same time, the Court is not required to credit "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . [with] a presumption of truthfulness."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal citations and quotations omitted).  The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedures 8(a) and 12(b)(6) is plausibility."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61).  To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

---

[2] In addition to seeking a court judgment, GTR also sent written demands for payment to OriginClear's customers.  *See* ECF No. 12 ¶¶ 115-19.

6

Pursuant to Rule 12(b)(6), a complaint is deemed to include "any statements or documents incorporated into it by reference." *Paulemon v. Tobin*, 30 F.3d 307, 308-09 (2d Cir. 1994); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudication of such a motion may review only a narrow universe of materials. Generally, [a court does] not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." (modified)). A document is incorporated in the complaint if the complaint expressly refers to it, *see id.*, and is considered integral "where the complaint relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Thus, the Court will not only consider the allegations in Plaintiff's Amended Complaint, but the documents attached to the Amended Complaint and incorporated by reference therein.

## DISCUSSION

Defendants assert that Plaintiffs' case must be dismissed on various grounds, including that (1) this Court cannot vacate a state court judgment; (2) the transactions at issue here are not loans and are therefore not subject to New York General Obligations Law §§ 5-511 or 5-513; (3) Plaintiffs fail to state a RICO Act claim; and (4) an unjust enrichment claim is improper where an agreement governs. The Court addresses each argument in turn.

I.  **Plaintiffs' First Cause of Action: Vacatur of Confession of Judgment**

Defendants first argue that Plaintiffs' cause of action seeking to vacate the judgment entered by the New York Supreme Court, Ontario County, must be dismissed due to lack of jurisdiction pursuant to the *Rooker-Feldman* doctrine. ECF No. 16 at 12-14. In response, Plaintiffs assert that *Rooker-Feldman* is inapplicable because the case was removed from state court. ECF No. 19 at 11.

The *Rooker-Feldman* doctrine makes clear that federal district courts lack jurisdiction of cases which are, in substance, appeals from state courts. The Supreme Court has stated that the doctrine is confined to cases wherein: (1) the plaintiff bringing the case lost in state court; (2) the injuries suffered were caused by the state court judgment; (3) the plaintiff is inviting district court review and rejection of those judgments; and (4) the state court judgment was rendered before the district court proceedings were commenced. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Plaintiffs do not dispute that each of these requirements are met here. Indeed, a judgment was entered in state court in Defendants' favor in the amount of $143,083.17, ECF No. 12-7 at 1-4, and Plaintiffs now complain of such injuries. Moreover, Plaintiffs have invited review and rejection of such decision, and did so only after judgment was entered.[3]

Nevertheless, a "defendant may not defeat [a] claim by removing it to federal court and then obtaining its dismissal on the grounds of the federal court's lack of jurisdiction." *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014), *cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 619-20 (2002). The proper course, therefore, is to remand this claim back to the state court, rather than dismiss it outright. *Vossbrinck*, 773 F.3d at 427. Indeed, the Court is concerned with the allegations set forth here—specifically, the allegation that Defendants sought a judgment by confession after entering the Settlement, which by its own terms acted as a complete satisfaction of all claims GTR may have against Plaintiffs, and through which GTR agreed to cease any and all collection efforts including the execution of judgments. ECF No. 12-9 at 1. The Court remands this claim back to the Supreme Court of New York, Ontario County.

---

[3] Plaintiffs cite *Novello v. Manor Oak Skilled Nursing Facilities, Inc.*, No. 04-CV-415E(F), 2004 WL 2039800 (W.D.N.Y. Sept. 13, 2004), for the proposition that *Rooker-Feldman* is inapplicable to cases removed from state court. ECF No. 19 at 11. That principle has no application here: in a single action removed from state court, *Rooker-Feldman* does not bar a federal court from reviewing any orders entered by the state court "that were entered prior to removal," *Nasso v. Seagal*, 263 F. Supp. 2d 596, 608 (E.D.N.Y. 2003). But that is not what Plaintiffs seek to do here: they seek to have this Court vacate a judgment from an entirely separate action, not the present removed action. *See* ECF No. 12 ¶¶ 123-145.

**II.     Plaintiffs' Second and Third Causes of Action: Transactions are Void pursuant to N.Y. Gen. Oblig. Law §§ 5-511 & 5-513**

Defendants assert that Plaintiffs' second and third claims must fail because MCA transactions are not loans and therefore, fall outside of New York's usury laws. ECF No. 16 at 14. Additionally, Defendants assert that even if the transactions were loans, Plaintiffs' causes of action are time-barred because the final payment was made more than a year prior to Plaintiffs' commencement of the action in state court. *Id.* In response, Plaintiffs argue that the facts present here demonstrate that these transactions were, in fact, loans, *see* ECF No. 19 at 13, and that their last payment on the loan was made less than one year before filing the action, rendering the claims timely. *Id.* at 23. For the reasons that follow, Defendants' motion to dismiss these claims is granted.

"The essential element of usury is the existence of a loan or forbearance of money." *Womack v. Cap. Stack, LLC*, No. 1:18-CV-04192 (ALC), 2019 WL 4142740, at *4 (S.D.N.Y. Aug. 30, 2019) (citing *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017) (additional citations omitted) ("*TVT Capital*")). Without a loan, "there can be no usury, however unconscionable the contract may be." *TVT Capital*, 252 F. Supp. 3d at 280 (*quoting Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992)).

To constitute a loan, the transaction must involve a borrower and lender, who must have purposefully loaned money at a usurious rate. *Id.* at 281. "[C]ourts must determine a transaction's purpose by its true character, under all circumstances, rather than its title." *Womack*, 2019 WL 4142740 at *4 (citing *Kelly, Grossman & Flanagan, LLP v. Quick Cash, Inc.*, 950 N.Y.S.2d 723 (Sup. Ct. 2012) (additional citations omitted)). New York courts consider three factors in determining whether an agreement is a loan or an MCA under New York law: "(1) whether there is a reconciliation provision; (2) whether the agreement has an indefinite term; and (3) whether the

[lender] has any recourse should the merchant declare bankruptcy." *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, No. 16:cv-1545 (DRH)(GRB), 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019) (citing *K9 Bytes, Inc. v. Arch Cap. Funding*, 56 Misc. 3d 807, 817 (N.Y. Sup. Ct. 2017) (additional citation omitted)). An MCA transaction is not considered a loan where the agreement provides that the buyer purchase a fixed amount of the seller's future sales proceeds, deliverable to the buyer from a percentage of the seller's daily sales proceeds. *See id.* at *5-6. Rather, the primary indicator of a loan is the debtor's absolute obligation to repay the principal sum without risk to the creditor of the debtor's business failure. *See Zoo Holdings, LLC v. Clinton*, No. 107415/04, 2006 WL 297730, *4 (N.Y. Sup. Ct. Jan. 24, 2006). Even viewing the facts in the light most favorable to Plaintiffs, the factors which indicate the agreements constitute loans are not present here.

Plaintiff first asserts that while reconciliation provisions appear in both the July Agreement and August Agreement, the provisions are "a sham" and thus, support a finding that these agreements are loans. ECF No. 19 at 18. Indeed, focusing on a reconciliation provision often allows a court to determine the risk to the funding company and therefore, whether the transaction is really a loan. *See McNider Marine, LLC v. Yellowstone Cap., LLC*, No. 806796/2018, 2019 WL 6257463, at *4 (N.Y. Sup. Ct. Nov. 19, 2019) ("[W]hether the merchant may reconcile its fixed payment amount when there is a reduction of accounts receivable is often determinative of whether repayment is absolute," and therefore, whether the transaction is a loan).

Here, the July Agreement and August Agreements state that GTR "will debit the specific daily amount each business day and upon receipt of [Plaintiffs'] monthly bank statements . . . of each month reconcile the [Plaintiffs'] Account by either crediting or debiting the difference from or back to the [Plaintiffs'] Account so that the amount debited per month equals the specified

percentage."[4] ECF No. 12-1 at 1, ECF No. 12-4 at 1. The language continues to provide that GTR "may, upon [Plaintiffs'] request, adjust the amount of any payment due under this Agreement at [GTR's] sole discretion and as it deems appropriate." *Id.* Further, the Addendums to both the July Agreement and the August Agreement provide that Plaintiffs had the option to "request [that] a reconciliation [] take place," which would occur so long as Plaintiffs gave GTR all evidence and documents necessary to determine the appropriate amount. ECF No. 16-4 at 8, ECF No. 16-5 at 8.

The Court recognizes that reconciliation at the sole discretion of the lender often renders an agreement a loan. *See, e.g.*, *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S. 3d 309, 313 (N.Y. App. Div. 2020) (denying motion to dismiss claim on the grounds that, *inter alia*, the reconciliation provision was subject to the lender's sole discretion and therefore, suggested that the lender did not assume risk in entering the transaction); *see also McNider Marine*, 2019 WL 6257463, at *4 (finding reconciliation provisions to be illusory where there was no language that indicated the lender had a duty to reconcile, but rather, the lender had discretion to consider doing so). However, the contractual language here makes clear that—contrary to Plaintiffs' position that GTR was "under no obligation to reconcile," ECF No. 19 at 19—Defendants had a clear contractual duty to modify the debited withdraw amounts to comply with the agreed upon specified percentage. Plaintiffs seem to recognize as much: they assert that Defendants cannot "escape the[] duty to reconcile" by claiming that Plaintiffs failed to provide the information necessary to perform the reconciliation. *Id.* Likewise, Defendants, seemingly in

---

[4] Plaintiffs state that "Defendants misrepresented that they would reconcile payment amounts before debiting Plaintiffs' bank account," and in practice, did not do so. ECF No. 19 at 18-19. It is unclear whether Plaintiffs are attempting to assert that Defendants breached the agreements or an implied covenant of good faith and fair dealing by doing so. Regardless, because it is not the Court's responsibility to develop arguments on a party's behalf, the Court will confine its analysis to those claims clearly indicated in the briefing. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

acknowledgement of their duty to reconcile, state that the estimated withdraw amount "was subject to both reconciliation and to adjustment at Progressive's and/or OriginClear's request" and agree that a failure to do so "would constitute a breach of contract[.]" ECF No. 21 at 11-12.

Indeed, Plaintiffs allege that Defendants debited fixed payments and, in fact, refused to reconcile. Specifically, Plaintiffs state that on October 8, 2018, OriginClear's controller contacted Reich and requested a reconciliation of the daily payment amount as it was considerably in excess of 10% of OriginClear's receipts. ECF No. 12 ¶ 67. The controller stressed that the payment was "seriously creating a financial strain," provided bank statements to Reich, and explained that certain monies were received from investors rather than funds generated from the sale of goods and services. *Id.* ¶¶ 68, 69. Nevertheless, Reich rejected the request for reconciliation. *Id.* ¶ 69. Soon thereafter, Plaintiff requested a reconciliation which would actually reflect the ten percent actual receivables of OriginClear in the August Agreement, and the request was again denied. *Id.* ¶¶ 70, 71. Not only did Reich deny the request, but stated that he "would rather just file" a legal claim. *Id.* ¶ 72. OriginClear then made a third attempt for reconciliation explaining that pursuant to the August Agreement, the daily payment was meant to fluctuate with OriginClear's receivables, which necessitated a lesser amount. *Id.* ¶ 73. No matter, Reich rejected the request, proposing instead to reduce the payment amount only if OriginClear first wired a $100,000 payment to GTR. ECF No. 12 ¶ 74. Such allegations may be sufficient to show that Defendants breached the terms of the agreements, but the Court does not find that such conduct rendered the provisions illusory.[5] *See, e.g.*, *Power Up Lending Grp.*, 2019 WL 1473090 at *5 (finding that reconciliation clauses were not illusory, where reconciliation was mandatory, there was no minimum payment required,

---

[5] Plaintiffs do not allege a breach of contract claim here and therefore, the Court will make no determination as to whether such a claim is sufficiently pled. However, the Court notes that nothing in this Decision and Order prevents Plaintiffs—in accordance with the Federal Rules of Civil Procedures—from seeking leave to amend this cause of action to assert a claim for breach of contract or otherwise.

12

and lending company only had discretion to decline requests for reasons other than a change in monthly receipts).

In addition, despite Plaintiffs' allegations that the execution of the security agreements, guaranties, and affidavits of confessions in connection with each of the agreements rendered repayment absolute, ECF No. 12 ¶¶ 43, 45, 56, 58, "[t]he personal guaranty is no broader than the obligations under the [a]greement[s] and the requirement of payment by [Riggs] is no greater than that of [OriginClear]." *TVT Capital*, 252 F. Supp. 3d at 283 (quoting *Ideas v. 999 Restaurant Corp.*, No. 0602302/2006, 2007 WL 3234747, at *8-9 (N.Y. Sup. Ct. Oct. 12, 2007)). Moreover, the language in both the July Agreement and August Agreement—specifically, Section 1.8—states that the slow down of payments or failure to remit because Plaintiffs went bankrupt or otherwise ceased operations in the ordinary course would not be deemed a breach of the agreement. ECF No. 12-1 at 2; ECF No. 12-4 at 2; *see also Ideas*, 2007 WL 3234747, at *1 ("The transactions at issue here are clearly payable absolutely, and thus *loans* . . . . [the lender] backed up the risk with [a] personal guarantee and a security interest . . . any default of the Agreements (including the [business's] *closing or bankruptcy*) would trigger payment." (emphasis added) (footnote omitted)).

Even if Plaintiffs successfully pled that the agreements here were loans and subject to usury laws, the claim for relief would still fail. Usury claims are subject to a one-year statute of limitations. *See Kwon v. Santander Consumer U.S.A.*, No. 15-cv-3352 (SJF)(AKT), 2016 WL 6518578, at *3 (E.D.N.Y. Oct. 6, 2016) ("Pursuant to N.Y. C.P.L.R. 215, an 'action to recover any overcharge of interest or to enforce a penalty for such overcharge' must be commenced within one (1) year." (citations omitted)). Such a claim accrues on the date that the overpayment is made. *See McNellis v. Raymond*, 329 F. Supp. 1038, 1043 (N.D.N.Y. 1971).

Plaintiffs do not contest that the date the last payment was made on the August Agreement was October 30, 2018—more than one year before this case was initially filed in New York State Supreme Court, Ontario County on October 12, 2020.  ECF No. 12 ¶ 96; *see also* ECF No. 1 ¶ 1. Rather, in opposition to Defendants' position that such claims are barred by the statute of limitations, Plaintiffs assert that the relevant date of payment is March 14, 2020—the date on which the last payment on the Settlement was made.  ECF No. 19 at 23.  In support of this position, Plaintiffs assert that "if the usurious obligation transcends into the settlement agreement, then it remains void forever and unenforceable."  *Id.* at 22 (citing *Matter of Estate of Jackson*, 508 N.Y.S.2d 671, 674 (N.Y. App. Div. 1986)).  Thus, Plaintiffs argue that because the usurious nature of the loan continued into the settlement, the last usurious payment was March 20, 2020 and the claims are not barred.

However, in *Jackson*, the court noted that "if the parties to a usurious contract or obligation agree to abandon the void agreement and execute a new obligation for the amount of the actual debt, free from usury, . . . then the second agreement purges the first of its usurious taint and makes the second obligation valid and enforceable."  *Jackson*, 508 N.Y.S.2d at 674 (citations omitted). While Plaintiffs conclusively state that the "usury continued into the settlement agreement," the allegations in the Amended Complaint do not support such a position.  The Amended Complaint indicates that in *total* (between the July Agreement, August Agreement, and Settlement), OriginClear was to pay GTR $431,469 in exchange for $218,135, ECF No. 12 ¶ 99, resulting in a usurious rate, but there are no factual allegations which indicate that the Settlement itself contained a usurious interest rate.  *See Adar Bays, LLC v. 5Barz Int'l, Inc.*, No. 16 Civ. 6231 (NRB), 2018 WL 3962831, at *4 (S.D.N.Y. Aug. 16, 2018) (refusing to determine whether a successful usury defense results in a cancellation of interest where the party did not establish that the settlement

14

agreement contained a usurious interest rate).  Likewise, there are no allegations that the Settlement was, in fact, a continuation of the August Agreement.  Rather, the Amended Complaint asserts that the Settlement embodied the understanding that the payment was in complete satisfaction of any underlying debt (on the July Agreement and the August Agreement).  ECF No. 12 ¶ 98; *see, e.g.*, *Thales Alenia Space France v. Thermo Funding Co.,* LLC, No. 13-cv-712 (SAS), 2014 WL 3887711, at *4 (S.D.N.Y. Aug. 7, 2014) (plain language of the settlement demonstrated the creation of new obligations and failed to include any language demonstrating an intent to continue the prior obligations).  Thus, as pled, the Settlement is a separate agreement and the claim, even if adequately pled, would be time-barred.

### III. Plaintiffs' Fourth and Fifth Cause of Action: Violation of the RICO Act and Conspiracy to Violate the RICO Act

Pursuant to 18 U.S.C. § 1962, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  In order to establish a claim under the RICO Act, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through either a pattern of racketeering activity or the collection of an unlawful debt.  *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989).  Where the conduct underlying a RICO Act claim is the collection of an allegedly unlawful debt, a plaintiff must establish, "(1) that the debt was unenforceable under state or federal usury laws; (2) that the debt carried twice the enforceable interest rate; and (3) that the debt was incurred in connection with the defendants' business of lending money at a usurious rate."  *Weisel v. Pischel*, 197 F.R.D. 231, 241 (E.D.N.Y. 2000) (citing *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 247-48 (2d Cir. 1985) (establishing civil RICO Act standard for claims premised on the collection of an unlawful debt)).

Because the Court has determined that Plaintiffs failed to sufficiently allege that the transactions at issue here were loans and therefore subject to New York's usury laws, the RICO Act claim, which relies on such underlying claim, must fail.  Further, because Plaintiffs do not sufficiently plead a RICO claim, the RICO conspiracy claim must also fail.  *See D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 669 (2d Cir. 2014) (summary order) ("The failure to state a claim for a substantive RICO violation . . . is fatal to plaintiffs' RICO conspiracy claim under § 1962(d)." (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d. Cir. 2004))).

### IV.   Plaintiffs' Sixth Cause of Action:  Unjust Enrichment

Finally, Defendants assert that Plaintiffs' unjust enrichment claim must fail because it is based on the success of the usury claim as an unjust enrichment claim may only be imposed in the absence of a contractual agreement.  ECF No. 16 at 21.  However, Plaintiffs maintain that the agreements constitute usurious loans and are void.  Therefore, Plaintiffs assert they are entitled to an unjust enrichment claim as they have shown that the Defendants were (1) enriched, (2) at Plaintiffs' expense, and (3) it is against equity and good conscience to permit Defendants to retain the moneys sought to be recovered.  ECF No. 19 at 30-31.

For the reasons set forth above, the Court has determined that Plaintiffs' usury claims fail.  Because Plaintiffs do not articulate any theory of unjust conduct independent of the alleged usurious agreement, the unjust enrichment claim must fail.  *See Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 54-55 (E.D.N.Y. 2020) (citing *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479-80 (S.D.N.Y. 2016)).  However, that does not preclude Plaintiffs from seeking remedies under contract law.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 16, is GRANTED IN PART and DENIED IN PART. Plaintiffs' claim seeking an order vacating the confession of judgment entered in state court is REMANDED for further proceedings, Plaintiffs' remaining claims are DISMISSED without prejudice. Plaintiffs shall have 30 days from the date of this Order to file a Second Amended Complaint if they so choose.

IT IS SO ORDERED.

Dated: December 14, 2021
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York